**In re SWANSEA CONSOLIDATED RESOURCES, INC., Debtor.**

**Bankruptcy No. 90–12279.**

United States Bankruptcy Court, D. Rhode Island.

June 7, 1993.

*Richards,* —— U.S. at ——, footnote 8, 112 S.Ct. at 2216, footnote 8.

Stephen S. Gray, Chapter 7 Trustee, The Recovery Group, Boston, MA.

William M. Dolan III, Brown, Rudnick, Freed & Gesmer, Ltd., Providence, RI, for Chapter 7 Trustee.

Barbara Harris, Richard Galli & Associates Inc., Providence, RI, for debtor.

John P. Fitzgerald, Asst. U.S. Trustee, Office of the U.S. Trustee, Boston, MA.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Before the Court are the Applications for Administrative Fees and Expenses of:· (1) the Chapter 7 Trustee, Stephen S. Gray, in the amount of $108,032 and $2,480; (2) Counsel for the Trustee, William Dolan, Esq., and the firm Brown, Rudnick, Freed & Gesmer, in the amount of $36,657 and $2,992; and (3) Debtor's counsel, Barbara Harris, Esq., in the amount of $30,231 and $492. After hearing on February 11, 1993, the parties and the United States Trustee were given additional time to submit memoranda addressing disclosure and disinter-

estedness issues which were raised for the first time at the fee hearing. Upon consideration of those filings, the matter is ready for disposition. We will first address the reasonableness of the applications of the Trustee and his attorney, and then consider Ms. Harris' disclosure problems.

### The Legal Framework for Review of Fee Applications

■ As is almost universally the case, in this circuit, pursuant to 11 U.S.C. § 330, the lodestar approach is applicable in determining the reasonableness of fees in bankruptcy. *Furtado v. Bishop*, 635 F.2d 915 (1st Cir.1980); *In re Casco Bay Lines, Inc.*, 25 B.R. 747 (Bankr. 1st Cir.1982); *In re Bishop*, 32 B.R. 302, 303 (Bankr.D.R.I. 1983); *In re Smuggler's Beach Prop., Inc.*, 149 B.R. 740 (Bankr.D.Mass.1993). The lodestar figure is calculated by determining "the number of hours reasonably expended multiplied by a reasonable hourly rate." *Furtado v. Bishop*, 635 F.2d at 920.

■ The reasonableness of the hourly rate is based, inter alia, upon a consideration of the rates customarily charged in the geographic area for similar services, as well as the skill and reputation of the professionals involved.[1] *Calhoun v. Acme Cleveland Corp. and the Cleveland Twist Drill Co.*, 801 F.2d 558 (1st Cir.1986); *Furtado v. Bishop*, 635 F.2d at 920; *In re Bishop*, 32 B.R. at 304 n. 4.

The number of hours *reasonably* expended also involves the consideration of a number of factors. In *In re Casco Bay Lines, Inc.*, 25 B.R. at 755, the court observed that "the hours *actually* expended by an attorney do not necessarily constitute the hours *reasonably* expended. The court 'should review the work done to see whether counsel substantially exceeded the bounds of reasonable effort.'" *Id.* at 755 (quoting, *Pilkington v. Bevilacqua*, 632 F.2d 922, 925 (1st Cir.1980)) (emphasis in

---

1. In *In re Casco Bay Lines, Inc.*, 25 B.R. 747, 755 (Bankr. 1st Cir.1982), the court stated that [t]he determination of a reasonable hourly fee in a bankruptcy case requires consideration of some, if not all of the following Johnson criteria: the customary hourly fee (5), the

level of skill necessary to perform the services (3), whether the fee is fixed or contingent (6), time limitations (7), the amount to be obtained (8), the reputation of the attorneys (9) and the undesirability of the case (10).

original). The following factors, originally identified in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974), and adopted by the First Circuit in *King v. Greenblatt*, 560 F.2d 1024 (1st Cir.1977), have been held relevant to the determination of the reasonableness of the time expended: (1) the time and labor required, from the perspective of the novelty and difficulty of the questions presented; (2) the opposition encountered; (3) the amount involved; and (4) the disallowance of duplicative hours. *In re Casco Bay Lines, Inc.*, 25 B.R. at 755. The determination of the lodestar, however, does not conclude our inquiry.

█ An additional element often considered by this and other courts, the "result" or "benefit to the estate" test, is relevant in determining the reasonableness of the request. This factor however, is to be applied *after* the initial computation of the lodestar. The First Circuit Bankruptcy Appellate Panel analyzed this element as follows:

> Not only is it often difficult to fractionalize every adversary proceeding, cause of action and dispute in a typical reorganization proceeding ... but even more importantly, time spent upon an issue which an attorney ultimately loses may be beneficial in connection with the aims of the estate in general. [citation omitted] In short, while a battle may be lost in a reorganization proceeding, it is the result of the war that is paramount.
>
> Rather than attempting to grade in the net benefit or the results of the reorganization proceeding by making corresponding fine adjustments in the number of hours spent on each and every task undertaken by counsel, we suggest the bankruptcy judge should reserve such an adjustment until the lodestar is determined. [citation omitted] In this way the objectivity of the lodestar can at least in some way, be preserved. Of course, hours spent on matters beyond that consistent with a standard of reasonable efficiency and productivity should be stricken from the lodestar calculation [citation omitted], but such an approach

ideally should be tempered with a view towards the need for the services at the time they were rendered.

*In re Casco Bay Lines, Inc.*, 25 B.R. at 756.

Thus, once the lodestar calculation is made, that figure "is adjusted up or down to reflect factors such as the contingent nature of success in the lawsuit, or the quality of legal representation, which have not *already* been taken into account in computing the 'lodestar' and which are shown to warrant the adjustment by the party proposing it." *Id.* (citing *Miles v. Sampson*, 675 F.2d 5, 8 (1st Cir.1982)). In *In re Casco Bay Lines*, we were instructed that it is under the "quality of legal representation" factor that

> a bankruptcy court should particularly consider the results of the attorney's participation in the bankruptcy proceeding, and the benefit to the estate to see if circumstances warrant adjustment of the lodestar figure.... [I]f a high-priced attorney performs in a competent but undistinguished manner a decrease in the hourly rate would be warranted.

*Id.* at 756. *See also Franks' Law Corp. v. St. Vrain Station Co. (In re St. Vrain Station Co.)*, 151 B.R. 549 (D.Colo.1993) (Bankruptcy court reduced fees because work provided little benefit to the estate); *In re Amberg*, 148 B.R. 376 (Bankr. D.Conn.1992) (fees denied because there was no benefit to the estate).

With the guidance furnished in these cases, we will address the instant applications, reminding applicants that "[e]ven without regard to objections by other parties in interest, the court has an independent judicial responsibility to evaluate professionals' fees." *In re Bank of New England Corp.*, 134 B.R. 450, 453 (Bankr. E.D.Mass.1991), *aff'd*, 142 B.R. 584 (D.Mass.1992) (citing *In re First Software Corp.*, 79 B.R. 108 (Bankr.D.Mass.1987)).

1. *The Application of Stephen S. Gray, Trustee*

The Trustee was appointed during the Chapter 11 phase of the case on November 8, 1991, and he assumed the management

of the Debtor's country club and golf course at that time. Mr. Gray was appointed after ten months of debtor-in-possession operation, during which the Debtor lost much of its credibility, strained the patience of creditors in their efforts to stay informed as to the details of the debtor-in-possession operation, and the announcement of the final straw—the unauthorized diversion of $64,000 of the Debtor's funds to a bank in Anguila, British West Indies. On August 27, 1992, when it became obvious that a feasible plan of reorganization was not forthcoming, the case was voluntarily converted to Chapter 7, and on September 11, 1992, Gray was appointed Chapter 7 Trustee.

The Trustee asserts that through his efforts the Debtor's major asset was sold for a price far in excess of the amount initially contemplated, with the result that the first mortgagee was paid $2.6 Million; $400,000 went to the second mortgagee; and, after the proposed payment of $195,210 in administrative fees and expenses, a distribution of $178,619 (9%) is expected to be paid to unsecured creditors. This result, the Trustee contends, supports the reasonableness of his request for a commission in the amount of $110,513.

After a close review of the Trustee's First Interim Request, we find that, overall, the application conforms with the level of detail established in this Circuit in *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945 (1st Cir.1984) and its progeny, but upon consideration of the factors laid out in *Boston & Maine Corp. v. Moore*, 776 F.2d 2 (1st Cir.1985) for determining reasonableness, it requires some adjustment.[2]

■ First, we note that the Trustee bills for his services at $275 per hour. This is markedly higher than rates charged by most professionals who appear regularly before this Court, and is requested without support for such a lofty rate, in this relatively uncomplicated bankruptcy case which started in Chapter 11, foundered, and ended up liquidating in Chapter 7. Based upon our consideration of: (1) the hourly rates customarily charged in this jurisdiction;[3] (2) the services performed; (3) the complexity of the case; and (4) the applicant's level of expertise, which we find here to be on a par with (but not necessarily superior to) that of local professionals, we conclude that $200 per hour[4] is the maximum rate allowable to the Trustee for his services *in this case*. With $200 as the lodestar, we have reviewed the entries in the Trustee's application and find them to be reasonable and adequately detailed, and that his time of 77.20 hours warrants compensation in the amount of $15,440 for the services performed by Mr. Gray personally.

■ As for the rest of Mr. Gray's application, we see problems with a number of items, specifically: (1) extensive "lumping" of tasks, making it impossible to review the reasonableness of time devoted to

---

**2.** In *In re Roco Corp.*, 64 B.R. 499, 502 (D.R.I. 1986), the District Court made clear that "11 U.S.C. § 326(a) (1978) capped the fees which could be awarded to a trustee for his services in such capacity, but created no entitlement to a commission in that amount." To the contrary, the court went on to say "[i]t matters little that [the] application is for a trustee's commission as opposed to an award of counsel fees, in either event, § 330(a) by its express language applies, and time *reasonably and productively* spent becomes a key ingredient of the fee-setting recipe." *Id.* at 504. (emphasis added.)

**3.** In *Mokover v. NECO Enterprises, Inc.*, the District Court stated:

One of the issues is not what are the plaintiffs' attorneys' usual and customary charges in the locality where they principally practice, but what is a reasonable charged [sic] in the local-

ity where the services are rendered. If counsel choose to become involved in litigation in Rhode Island, it is the Rhode Island reasonable fees which obviously should apply.... It is this Court's clear perception that the current rate for a senior partner's services is in the range of $180 per hour. Associates should appropriately be allowed a maximum compensation of $125 per hour.

*Mokover v. NECO Enterprises, Inc.*, 785 F.Supp. 1083, 1092 (D.R.I.1992); *see also Lamphere v. Brown University*, 610 F.2d 46, 48 (1st Cir.1979) ("We are somewhat surprised that the court equated the City of Providence with Boston, a city with an unenviable reputation for high costs."); *In re Bishop*, 32 B.R. at 304.

**4.** With Judge Boyle's 1992 $180 per hour standard in *Mokover* as guidance, we feel comfortable allowing $200 per hour in light of the leeway we read into his use of "in the range of."

a particular task;[5] (2) duplication and overlap by the many consultants and analysts utilized in this case; (3) excessive time devoted to the performance of certain tasks, particularly the negotiation and preparation of the purchase and sale agreement which, according to the time billed by Robert Wexler alone,[6] consumed 94.90 hours, at $175 per hour, for a total charge of $16,608; and (4) improper use of paraprofessionals. The following table taken from the Trustee's application is illustrative:

| CONSULTANT | TITLE | RATE | HOURS BILLED | TOTAL BILLED |
|---|---|---|---|---|
| Peter E. Nawrocki | Consultant | $150 | 14.00 | $ 2,100.00 |
| Parham Pouladdej | Consultant | $150 | 5.50 | 825.00 |
| Michael J. Epstein | Consultant | $150 | 0.30 | 45.00 |
| Kathleen T. Jones | Data Analyst | $100 | 14.80 | 1,480.00 |
| Robert J. Sheridan | Consultant | $100 | 17.00 | 1,700.00 |
| David S. Mesinger | Consultant | $ 75 | 333.50 | 25,012.50 |
| Kenneth S. Frieze | Data Analyst | $ 75 | 72.60 | 5,445.00 |
| Marjorie E. Kaufman | Data Analyst | $ 50 | 20.25 | 1,012.50 |
| Michele M. Marsan | Data Input | $ 30 | 9.00 | 270.00 |

While the time entries detail a variety of tasks quite properly performed by such paraprofessionals, and whose curriculum vitae reflect their extensive educational and professional backgrounds, the use of five different consultants, three data analysts and one data input person, unacceptably increases the expense to the estate through duplication and start up time, which is definitely not cost effective. In addition, at least two people on the Trustee's staff, David S. Mesinger, who billed 333.5 hours at $75 per hour for a total charge of $25,012, and Michele Marsan at $30 per hour, performed tasks we consider to be nonbillable "overhead" and which should be accomplished by clerks and messengers. We refer to time billed for making bank deposits, opening accounts, paying vendors and payroll, and all time billed for data input.

Accordingly, based upon the four categories discussed above, which we find require a downward adjustment of the time *reasonably* expended by or in behalf of the Trustee, that portion of his fee application is reduced by fifteen percent (15%). *See In re Smuggler's Beach Prop., Inc.*, 149 B.R. at 745 ("[B]ecause it is impossible to evaluate the reasonableness or necessity of such services, a percentage reduction of allowable time is appropriate."). This results in an allowance to the Trustee of $88,470 for services, and $2,480 in disbursements, for a total interim allowance of $90,950.

2. *The Interim Application of Brown, Rudnick, Freed & Gesmer for Compensation and Reimbursement of Expenses for the Period November 12, 1991 through August 31, 1992*

Counsel for the Trustee, the law firm of Brown, Rudnick, Freed & Gesmer ("BRF & G"), seeks interim compensation in the amount of $36,657 and reimbursement of expenses, initially in the amount of $4,070, but then in response to the United States Trustee's objection, in the reduced amount of $2,992.

5. In the past, we would be inclined to return the application with instructions that it be reformatted properly, and then reconsidered. Henceforth, however, lumping will be considered unacceptable, and such applications may be disallowed on that basis.

6. As noted, due to the extensive lumping of time, wherein all activities of a named professional for a given day are listed under one time entry, it is impossible to determine the time expended on a particular task. As other courts have often pointed out, the failure of a professional to provide detailed time records is at his [her] peril, and calls for a substantial reduction in any award. *In re Bank of New England Corp.*, 142 B.R. at 584–585 (citing *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 951 (1st Cir.1984)).

The U.S. Trustee also posed a general objection to the application, based upon "the lack of delegation of work to more junior attorneys. The United States Trustee notes that Mr. Dolan personally billed 84% of all attorney time in this Application, at the rate of $200 per hour." At the hearing, Theodore Orson, Esq., appearing for Mr. Dolan, explained to our satisfaction that the majority of the services were performed more expeditiously and economically through Dolan's efforts, than had they been delegated to lower-priced, but less experienced associates. The First Circuit has approved this practice, in appropriate circumstances. *See Boston & Maine Corp. v. Moore*, 776 F.2d 2.

> Associates, however, are not invariably more cost-effective than partners. In some circumstances, and assuming of course that the partner is not performing merely routine work, the use of a more experienced attorney may save time because of his ability to size-up and do only what needs to be done most effectively.

*Id.* at 9. Our review of the described services supports the applicant's contention, and we will not reduce it on that basis.

Upon consideration of the entire application however, we find that it suffers from many of the same shortcomings appearing in the Trustee's application, specifically: (1) excessive lumping of tasks; (2) duplication or overlap of services with those performed by the Trustee and his staff; (3) excessive time per task, in some instances; and (4) improper use of paraprofessionals.

We also find duplication and overbilling in the services performed by Mr. Dolan and the Trustee (or his designee). Here, as in the Trustee's application, an exorbitant amount of time was expended on the purchase and sale agreement, i.e. 26.8 hours for revising and reviewing that document. This results in a $4,998 charge by Mr. Dolan for that task alone. Together with the $16,607 billed by Mr. Wexler,[7] "revising

and reviewing" the purchase and sale agreement would cost the estate over $20,000. In the absence of a persuasive explanation why this particular task was so time consuming, especially with such efficient professionals on the scene, and based upon our own judgment, we find the amount of time devoted to this task to be excessive and unreasonable.

Finally, we address the need to differentiate between billable time for *legitimate paralegal* services, versus work performed by paralegals but consisting of ministerial and clerical tasks which are nonbillable "overhead." For example, in the instant application 15.3 hours were billed by legal assistants for: (1) traveling to the bankruptcy court to file pleadings or to make copies of orders or docket sheets; (2) performing facsimile transmissions or for copying documents within the office; (3) collating and/or arranging files; and (4) delivery services. (*See* docket entries 11/18/91, 11/19/91, 11/20/91, 12/24/91, 1/6/92, 1/17/92, 3/12/92, 4/16/92, 6/29/92, 7/1/92, 7/14/92, 7/16/92); *see In re Bank of New England Corp.*, 134 B.R. at 455. These examples, which are not exhaustive or all inclusive, clearly fall under the rubric of "ministerial," "clerical," or "messenger," and may not fairly be billed to the client at paralegal rates, which brings us to the subject of paralegal rates.

Compensation for paralegal services depends upon the type of work actually performed, as well as the skill and experience of the paralegal involved in the geographic area, not unlike the formula applied to attorneys. *See, e.g., In re Grenoble Apartments, II*, 152 B.R. 608 (D.S.D. 1993) (the rate for work performed by a paralegal must be in conformity with the local market). As guidance, the range of paralegal compensation may be as high as $70 per hour for services which approach those performed by junior attorneys, all the way to $0 for those performing routine

---

7. We have not analyzed in detail whether even other employees of the Trustee *also* billed regarding this category of service, and our reference thereto is merely illustrative. It is not the function of the Court to cross-reference and/or

scrutinize every fee application with this level of detail, but in this case, the item was particularly prominent, even from a cursory review of the time entries. *See Mokover v. NECO Enterprises., Inc.*, 785 F.Supp. at 1090.

clerical or messenger type tasks. *See Mokover v. NECO Enterprises, Inc.,* 785 F.Supp. 1083, 1092–93.

Based upon all of the foregoing considerations, the Interim Fee Application of Brown, Rudnick, Freed & Gesmer is reduced by 10%, and ALLOWED in the amount of $32,991, and $2,992 in expenses.

### 3. *Application of Debtor's counsel, Barbara Harris, Esq.*

Finally, and from a totally different standpoint, we address the application of Debtor's counsel in the amount of $30,321 for services and $492 in expenses. This application is broken down into two time frames: (1) $24,120 for fees and $450 in expenses for the period December 1990 through August 1991, when Ms. Harris was an associate in the law offices of, initially, Gordon & Levitt, and thereafter, Gordon, Harris & O'Brien; and (2) $6,111 for fees and $41.29 in expenses for the period September 1991 through April 1992, when she was employed by Richard Galli & Associates.

At the hearing, the United States Trustee objected on the ground that (1) "the Applicant seeks $2,007.50 for work performed after the appointment of a Chapter 11 Trustee in this case. The United States Trustee is concerned that some of this work may not have been of benefit to the estate"; and (2) [g]iven the lack of approval of the plan formulated by Applicant, the United States Trustee recommends a significant reduction from the fees requested." The U.S. Trustee also objects to the reimbursement of certain expenses for photocopying and facsimile charges, because

the actual per page cost of these items was not stated.

A more substantive issue arose at the hearing, however, with which the U.S. Trustee was unfamiliar until the Applicant was questioned regarding disclosure and disinterestedness, vis-a-vis her initial employment as Debtor's counsel. After considerable inquiry, it was elicited that at the time of her employment Ms. Harris was an associate in the law firm wherein its two partners were also insiders of the Debtor. There was no disclosure of these facts to the United States Trustee [8] or to creditors in either the application to employ, or in the Applicant's Rule 2014 affidavit,[9] as required by the Bankruptcy Code and Rules. The failure to so disclose was highlighted by the U.S. Trustee's unawareness of the situation until those facts were discussed at the fee hearing.

During the inquiry of Ms. Harris as to the accuracy of her affidavit, the response was that *she* was the attorney handling the case, that *she* had no connection with the Debtor, and that therefore, *she* saw no need to disclose her law firm's interest. This contention is misleading at best, and belies the fact that Ms. Harris was taking instructions from her employers who were also the principals of the Debtor, and who stood to benefit financially and otherwise from her efforts. We can hardly imagine a clearer violation of the Code and the Rule, and our concern is articulated in the comments of Judge Brooks in *In re TMA Assocs., Ltd.,* 129 B.R. 643 (Bankr.D.Colo. 1991), when he said, in a partnership context,

---

**8.** Ms. Harris' contention that the U.S. Trustee was fully aware of this situation, echoed by Mr. Gordon in his memorandum, is incorrect, or at least disputed, in light of (1) Mr. Fitzgerald's representation that he was unaware of such a relationship; and (2) the fact that Assistant U.S. Trustees appearing in this jurisdiction are not local attorneys, but visitors from Boston who are not familiar with the affiliations of attorneys practicing in Rhode Island.

The suggestion, however, that the Debtor's principals and/or its counsel are excused from compliance with disclosure rules intended to ensure disinterestedness "because Providence is

a small town" is ludicrous, and deserves no further attention.

**9.** Even if it were accurate, Mr. Gordon's argument that "everyone was aware of the situation" does not cure the defective affidavit. "[E]ven affirmative creditor consent to employment of attorneys or to fee arrangements in violation of 11 U.S.C. § 327 would not obviate the duty of the Bankruptcy Court to enforce the statutory and ethical standards which govern the employment of fiduciaries." *In re Automend, Inc.,* 85 B.R. 173, 179 n. 8 (Bankr.N.D.Ga.1988) (citing *In re Roberts,* 46 B.R. 815, 844 (Bankr.D.Utah 1985)).

**36**

.[t]hese candid remarks [10] reflect Counsel's ill-defined sense of the entangled relationships and numerous conflicts, actual and/or potential, and the Firm's readiness to simply overlook or ignore the problems and pervasive appearances of impropriety with which this Court is bound to deal head on.

*Id.* at 647; *see also In re Sixth Avenue Car Care Ctr.,* 81 B.R. 628 (Bankr.D.Colo. 1988) (an appearance of impropriety may undermine the public's confidence in the fairness of bankruptcy proceedings).

At the conclusion of the hearing, we granted all interested parties additional time to file briefs, and have received written submissions by: (1) the U.S. Trustee, objecting to the application in toto; (2) the Chapter 7 Trustee, requesting that the application be disallowed in its entirety; (3) Richard Galli & Associates, defending the actions of Ms. Harris; and (4) Stephen A. Gordon, Esq., finding no fault with the affidavit, and requesting that the application be allowed in full.[11]

The law on this issue is uncomplicated and it is uniform. 11 U.S.C. § 327(a) requires that a professional employed in a bankruptcy case *not* "hold or represent an interest adverse to the estate, and that [they be] disinterested persons." The phrase "adverse interest," while not specifically defined in the Code, has been interpreted as follows:

(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is rival claimant; or

(2) to possess a predisposition under circumstances that render such a bias against the estate.

Donald F. Neiman, *Multiple Representation Problems in Bankruptcy Practice,* 3 BANKRUPTCY BRIEFS 1, 3 (Winter 1993) (citing *In re Lee,* 94 B.R. 172, 177 (Bankr. C.D.Cal.1988)). Moreover, one who serves as agent or attorney for entities holding adverse interests is also deemed to "represent an adverse interest." *Id.*

11 U.S.C. § 101(14) defines "disinterested person" as one who "is not ... an insider," § 101(14)(A); "is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor," § 101(14)(D); or "does not have an interest materially adverse to the interest of the estate or of any class of creditors ..., by reason of any direct or *indirect relationship to,* connection with, or interest in, the debtor," § 101(14)(E) (emphasis added).

Fed.R.Bankr.P. 2014(a) sets forth the requirements for professionals seeking bankruptcy court approval for employment. Predominant among such requirements is the disclosure in a verified statement "setting forth the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants...."

The Court in *In re EWC, Inc.,* 138 B.R. 276, 280 (Bankr.W.D.Okla.1992) discussed the above criteria at length, finding that "[t]hese disclosure requirements are not discretionary. It is the duty of professionals to disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and parties in interest as well as fee arrangements. They cannot pick and choose which connections are irrelevant or trivial."

Here, Ms. Harris attempted to circumvent the disclosure rules by stating, under oath, that she was the sole applicant.[12]

---

10. *These candid remarks* are:

[I]f in the worst of all possible worlds our firm would have to file a bankruptcy for one of these individuals, we would have to list the [general partner's equity] obligation [to the limited partner], but I don't really count that as representation of them in regard to a claim.

*Id.* at 647.

11. Mr. Gordon's memorandum is filled with erroneous assumptions, self-serving statements, and out and out falsehoods, and his concern with the outcome of this fee application is illuminating on the disinterestedness requirement, and the dangers inherent in its violation.

12. Mr. Gordon argues that "[f]or the most part, all pleadings filed on behalf of the Debtor, were filed on stationery that identified the law firm of GHO as well as Ms. Harris." (Mem.Supp.

The failure to reference her law firm cannot be regarded as anything other than a material violation of Bankruptcy Code § 327 and Fed.R.Bankr.P. 2014(a) requiring the forfeiture of all compensation in this case. *See In re Marine Outlet, Inc.*, 135 B.R. 154, 156 (Bankr.M.D.Fla.1991), holding that:

> There is no duty placed on the United States Trustee or on creditors to search the record for the existence, vel non, of a conflict of interest of a professional sought to be employed. On the contrary, there is a definite affirmative duty placed on a professional to disclose his or her connection with parties whose interest is or may be antagonistic or opposite to the interest of the general estate and a failure to comply with the mandate of Bankruptcy Rule 2014(a) merits a total forfeiture of all fees.

(citing *In re B.E.S. Concrete Prod., Inc.*, 93 B.R. 228, 237 (Bankr.E.D.Cal.1988)).

Judge Brooks also commented on this issue:

> This Court believes that '[m]eaningful disclosure is the key to proper employment of professionals and, not incidentally, to more fully and fairly protecting all claims and interests of third parties ... requiring notice and full disclosure better insures the integrity of the bankruptcy system.' *Western Office Partners* [*Ltd.*], *supra* [105 B.R. 631] at 637 [ (Bankr.D.Colo.1989) ]. *See also* [*Matter of*] *King Resources* [*Co.*], *supra* [20 B.R. 191] at 201 [ (D.Colo.1982) ] (duty to divulge conflicts); *Sixth Avenue Car Care Center, supra* at 631 (obligation runs not only to the client but also to the court); [*In re*] *Roberts, supra* [75 B.R. 402] at 410 [ (D.Utah 1987) ] (the court has no duty to search the file to determine for itself that a prospective attorney is not involved in conflicts of inter-

est; it is the attorney's duty to so inform the court) (cases cited). *Accord, In re Hathaway Ranch Partnership*, 116 B.R. 208, 219 (Bankr.C.D.Cal.1990).

*In re TMA Assocs., Ltd.*, 129 B.R. 643, 648.

In *In re EWC, Inc.*, 138 B.R. at 280, the bankruptcy court held that any violation of the disclosure rules is sufficient to deny all compensation, even if only for *de minimis* violations, citing to *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 268–69, 61 S.Ct. 493, 497–98, 85 L.Ed. 820 (1941) that "the only way to assure that professionals maintain the requisite standards of fiduciary conduct is to strictly enforce compliance with the conflict of interest rules by denial of compensation" and that "the mere presence of a conflict, even if no resulting harm had befallen the estate, justified denial of compensation." *Id.* at 280. Here, we find that the action of the Applicant was taken knowingly, to avoid compliance with the rule, in an effort to further the interests of the principals of the Debtor, which were clearly adverse to those of the Estate.

■ Finally, Ms. Harris argues that even if she is denied compensation for the time she worked for Messrs. Gordon and Levitt, and GHO, payment should be authorized for the period September 1991 through April 1992, when she was employed by Richard Galli & Associates. While we agree that during this employment Ms. Harris was not guilty of the same disclosure violations as during her GHO tenure, two different legal issues are presented regarding this time period:[13]

■ (1) On November 8, 1991, Stephen Gray was appointed Chapter 11 Trustee, and from that point forward any services rendered by Ms. Harris are presumed to have been in behalf of the Debtor's principals, and not for the benefit of the Estate.

Fees, Feb. 22, 1993, ¶ 4, at 2). What Mr. Gordon ignores is that both the application for employment and the accompanying affidavit of disinterestedness fail to identify the law firm of Gordon & Levitt, or GHO. More importantly, both documents specifically describe Ms. Harris as the sole applicant, with the intention, we find, of creating the false illusion of distance

between herself, the firm's partners, and the Debtor's principals.

13. Contrary to her representations at the hearing, Ms. Harris did not obtain a new authorization to serve as Debtor's counsel upon her transfer to Galli & Associates. At most, she telephoned the clerk's office advising of her change of address.

In fact, although she claims great credit for having informed the Court and parties of the "Anguila affair," [14] all of the time billed to this category was a result of the actions of the principals or their agents, who were operating the business and handling the cash,[15] and it is clear that none of this time should be paid for by creditors.

(2) In the absence of a showing of a tangible benefit to the estate, we agree with *In re TS Indus., Inc.*, 125 B.R. 638 (Bankr.D.Utah 1991), which in turn adopted the holding in *NRG Resources, Inc.*, 64 B.R. 643 (W.D.La.1986) that:

> Once the Trustee had been appointed and assumed the day to day operation of the hotel and casino, debtor's counsel's role should have subsided somewhat. However, [the firm] continued to take a very active role in researching, preparing and defending various motions.... At least one court has held that once a trustee has been appointed the debtor and its counsel have no role and cannot receive compensation. [citing *NRG Resources*]. However, in light of the provisions of 11 U.S.C. § 330 which permit compensation to a debtor's attorney, the Court believes that the correct approach is not to disallow fees but to scrupulously inquire into such services so as to ascertain whether or not they were for the benefit of the estate or for some other interest.

Upon review of the application of Galli & Associates, and giving Ms. Harris credit for all of the time that could possibly be construed as benefiting the Estate, her application is allowed in the amount of $1,000, for the period September through November, 1991.

Enter Judgment consistent with this opinion.

---

**14.** As an officer of the Court, Ms. Harris had absolutely no choice *but to disclose* the fact of the missing $64,000.

**15.** According to the Trustee, "the management of the Debtor used the Debtor's cash to purchase certain bearer bonds through a rather circuitous series of transactions, converting these bonds back to cash and deposited the money in Anguila, an island in the British West Indies." (Trustee's Applc. at 3.)