**In re The LIGHTING CENTER, INC., Debtor.**

**Bankruptcy No. 92–13030.**

United States Bankruptcy Court, D. Rhode Island.

Feb. 9, 1995.

**322**

William G. Billingham, Marshfield, MA, for debtor.

Deena F. Christelis, Geremia, DeMarco & Christelis, Providence, RI, for Chapter 7 Trustee.

Leonard M. Frisoli, Jr., Frisoli & Associates, Cambridge, MA, for Tobin & Co., C.P.A.

Sheryl Serreze, Office of the U.S. Trustee, Providence, RI.

### DECISION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on July 28, September 1, and October 20, 1994, on the Fee Application of Tobin & Company, accountant for the Debtor, and on the Chapter 11 Trustee's Motion for Disgorgement of approximately $66,000 already paid to the Applicant without prior Court approval. The first two applications filed by Tobin were patently deficient, and at the close of both the July and the September hearings we permitted Tobin to re-file, in accordance with local requirements. Now before us is Tobin's second amended application for compensation in the amount of $57,-233.

Since there is a huge cash shortfall in this case, caused by the malfeasance of the principals and/or their agents during the debtor-in-possession period, disgorgement by Tobin is a foregone conclusion, if other Chapter 11 administrative expense creditors are to receive even partial payment on their claims. In this regard, we must set the amount of Tobin & Company's compensation as the first step in determining the total amount of Chapter 11 administrative expenses.

### BACKGROUND

On October 23, 1992, the Lighting Center filed a Chapter 11 petition, and on February 1, 1993, nearly four months later, an application to employ Tobin & Company as its accountant was filed. The application was approved on February 11, 1993, immediately upon the expiration of the objection period. The Debtor operated in Chapter 11 for several months, filing two disclosure statements that were never approved. On June 2, 1994, while awaiting the Debtor's second amended disclosure statement, an Emergency Motion for the Appointment of a Chapter 11 Trustee was filed by a creditor, Casablanca Fan Company, alleging that the Debtor had closed its retail operation and was planning to conduct an unauthorized "going out of business sale." One day later on June 3, 1994, Louis Geremia, Esq., was appointed Chapter 11 Trustee, and shortly thereafter he held a traditional liquidation sale, as well as a subsequent auction of the remaining assets. On July 27, 1994, the case was converted, and Mr. Geremia was appointed as the Chapter 7 Trustee.

While operating in Chapter 11, and prior to the appointment of a trustee, the Debtor accumulated $300,000 in unpaid post-petition debt! Dwarfed by this figure is the Trust-

ee's estimate that he has approximately $45,-000 on hand to pay Chapter 7 administrative expense claims in the amount of $22,950 (which must be paid first), *see* 11 U.S.C. § 726(b), and $174,000 in Chapter 11 administrative claims. With these numbers, it is clear that Chapter 11 administrative expense claimants will not receive 100% of their claims (as has Tobin & Company) and therefore, disgorgement by Tobin is a given. *See In re Kingston Turf Farms, Inc.*, 176 B.R. 308 (Bankr.D.R.I.1995). The real question is the amount Tobin & Company will be required to disgorge.

It is alleged, and conceded, that Tobin & Company received $66,936.25 during the fourteen month period—October 8, 1992, through December 2, 1993. Of that amount, the Trustee does not contest $11,250 received by Tobin for pre-petition services that were earned and paid for in the normal course of the Debtor's business. There is also no objection to $5,000 that was only "funnelled" through Tobin, and delivered to Debtor's counsel, William Billingham, Esq., as a retainer for legal services. The Trustee does dispute, however, payments to Tobin & Company for the sale of computer software and services to the Debtor, which (Tobin says) should not be considered in this fee application.[1]

### DISCUSSION

Having reviewed Tobin's application according to the standards applicable in the First Circuit, *see In re Swansea Consol. Resources, Inc.*, 155 B.R. 28 (Bankr.D.R.I.1993); *In re Bank of New England Corp.*, 134 B.R. 450 (Bankr.D.Mass.1991), *aff'd*, 142 B.R. 584 (D.Mass.1992), we make the following comments, findings, and conclusions:

■ At the outset, the Applicant requests compensation for services beginning in September 1992, four months before its employment was authorized. Local Rule 25(A)(1) states:

Absent extraordinary circumstances, *nunc pro tunc* Applications for appointment of professional persons pursuant to Sections 327 and 1103 of the Bankruptcy Code, and Bankruptcy Rule 2014, will not be considered. An Application is considered timely if it is filed within thirty (30) days of the date of the filing of the petition in bankruptcy or the date the professional commences rendering services, whichever occurs later.

R.I. Local Bankr.R. 25(A)(1). The petition was filed on October 23, 1991, and the application to employ Tobin was filed on February 1, 1993. Therefore, any services rendered prior to January 1, 1993, were unauthorized. The Applicant has not alleged extraordinary circumstances regarding the delay in its employment, and therefore payment for services rendered prior to January 1, 1993, is not authorized.[2] *See In re Jarvis*, 169 B.R. 276 (Bankr.D.R.I.1994); *In re Luchka*, 152 B.R. 18 (Bankr.D.R.I.1993).

■ In looking at Applicant's hourly rate, we note that the rates range from $32 per hour for a staff assistant to $135 per hour for a partner. We find that these rates are reasonable for the services performed. Next, in determining the reasonableness of the time spent by the Applicant according to the standards set forth in *Boston & Maine Corp. v. Moore*, 776 F.2d 2, 6–7 (1st Cir. 1985); *see also Swansea*, 155 B.R. at 30–31, we find that a further reduction in the application is necessary for the following reasons: At the October 20, 1994 hearing, Mr. Tobin was questioned by counsel for the Trustee, as well as the United States Trustee, regarding computer hardware and software sold by Tobin to the Debtor during the Chapter 11 proceeding. Mr. Tobin states that his company sold and installed a "total accounting package" to the Debtor in late 1992 (postpetition). The computers and certain "*Real World*" accounting software were sold to the Debtor at a "nominal markup" and, in addition, Tobin provided consulting services to The Lighting Center at its usual rate of $80

---

1. We therefore start our analysis with the assumption that $50,686.25 has been paid to the Applicant and is subject to disgorgement—$66,-936.25 less $11,250 (pre-petition fees), less $5,000 (Billingham retainer).

2. The entries for that period total $16,033.50.

per hour.[3] Mr. Tobin admitted, in retrospect, that although the package was "helpful," the implementation of computer accounting at that time was probably ill advised because the employees did not know how to use the equipment.[4] For Tobin to sell its client a computer system, software, and associated consulting services just after the filing of its Chapter 11 petition, clearly was not in the best interest of the Debtor. *See* 11 U.S.C. § 330(a)(1). As the Chapter 11 Debtor's accountant, Tobin was the entity most familiar with the Debtor's financial condition[5] and workforce capability, and should have focused on cost reduction and economy, instead of attempting to institute a radically different accounting system, without first assessing the ability of the staff to accommodate to such a change. Requiring the employees to deal with a new and unfamiliar automated system, in addition to enduring all of the other stress and problems associated with Chapter 11 debtor-in-possession status was clearly ill advised, and only hastened the Debtor's demise. The total charge for these consulting services was $4,590. Although we are tempted to disallow *all* of the computer related expenses, the cost of the hardware and software will be allowed, on the assumption that this equipment added value to the Debtor's assets. The consulting services on the other hand, may have actually been of negative benefit to the estate, and this request is denied.

■ The Applicant also bills 29 hours for time spent on preparation of the disclosure statement and plan, for a charge of $3,892. Many of the entries for services regarding the disclosure statement are for tasks that are more appropriately the function of Debtor's counsel, and here they duplicate the services provided by Debtor's attorney, William Billingham, Esq., who requests payment for 22.1 hours spent in preparation of the disclosure statement and plan. *See Swansea*, 155 B.R. at 32–33; *In re Casco Bay*

*Lines, Inc.*, 25 B.R. 747, 755 (Bankr. 1st Cir.1982). The Applicant is ALLOWED five hours ($675) for assisting Debtor's attorney with the disclosure statement and plan, and the remainder of the request as to this item is DISALLOWED.

■ We also question the following entries:

| | | |
|---|---|---|
| 04/27/93 | Meet with Jeff Gagnon from Citizens Bank concerning status of company and new guarantee of principals when loan is transferred to Craig Ripple etc. | 2.00 |
| 07/15/93 | Meeting with Craig Ripple to prepare personal net worth statements | .75 |
| 07/28/93 | Meeting with Mr. & Mrs. Tarter on her guaranty | 1.00 |
| 11/19/93 | Meet with Bill Delmage—insurance agent on policy for Marc Tarter | 1.00 |
| 3/02/94 | Preparation of Craig Ripple's tax return | .75 |
| 03/03/94 | Preparation of Craig Ripple's tax return | .25 |
| 03/11/94 | Preparation of Keith Hendrix's tax return | 1.00 |
| 05/18/94 | Met Mr. Carl Barney of Taunton at the Lighting Center and introduced him to Mr. Tarter and discussed the opportunities. | 2.00 |
| | Discussed this opportunity with Mr. Hannigan of Taunton; unable to develop any interest. | .50 |

These entries indicate and/or suggest that the Applicant performed services on behalf of, and personal to, principals and management level employees of the Debtor, and raise questions of actual or potential conflicts of interest. Section 327(a) of the Code requires professionals employed by the estate to be disinterested and not hold or represent

---

**3.** Tobin testified that the Debtor's employees had limited computer experience, and that the bookkeepers were not very sophisticated and had no prior computer experience.

**4.** Tobin described the accounting package as keyed to "point of sale" and that for it to work properly the employee doing the sale was respon-

sible for entering the correct information when generating a computer invoice. Because it was taking ten to fifteen minutes to conclude a transaction, sales (not surprisingly) fell off dramatically.

**5.** The petition lists (grossly inflated) assets of $812,113 and liabilities of $934,875.

any interest adverse to the estate. *See* 11 U.S.C. § 327(a). The Code further provides that

> the Court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title, if at any time during such professional person's employment ... such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c). When an impermissible conflict exists, the Court may deny all compensation to the professional. *See, Rome v. Braunstein,* 19 F.3d 54, 58 (1st Cir.1994). We consider the application of that rule to be too severe in the present circumstances, however, and order instead that only compensation for the above-mentioned entries be DENIED, in the amount of $1,181.25.

■ There are several other entries that lack sufficient detail, and in light of the Applicant's demonstrated tendency to provide services to persons where there is the potential for conflict, we decline to allow compensation for said services. We refer to telephone calls and conferences with Craig Ripple and Mark and Phyllis Tarter, without explanation. (*See* entries of 2/8/93, 3/24/93, 5/19/93, 11/30/93, 12/29/93, 1/4/94, 1/19/94, 2/5/94, 3/23/94, 3/24/94, and 5/25/94). Since we are unable to determine the benefit for whom these services were rendered, and because the burden is on the Applicant to establish that said services were actual and necessary for the benefit of the estate, compensation for these entries is DENIED, in the amount of $1,304.

■ Finally, in reviewing the remainder of the application, we find that there is: (1) extensive lumping of tasks, making it difficult to determine the reasonableness of the time devoted to each particular task, *see Swansea,* 155 B.R. at 30–33; (2) excessive time devoted to the performance of certain tasks; *Id.* and (3) the use of .25 per hour minimum billing increments, as opposed to .10 increments.

*See In re Corporacion de Servicios Medico–Hospitalarios de Fajardo, Inc.,* 155 B.R. 1, 2–3 (Bankr.D.P.R.1993). Of the more than 250 entries that appear in the application, only 83 are in increments of less than one hour. The lowest increment we find is .25 hours, and we rule here, as we have in many other instances, that billing in this manner is unfair to the client. *See Id.*

■ One boilerplate entry that appears frequently, and which violates the rule against lumping, reads:

> Reconciled and adjusted approx. 37 balance sheet items, including five cash accounts, accounts and loans receivable, inventories, prepaid expenses, fixed assets and related depreciation, accounts payables, payroll and related taxes sales taxes (3 states), notes payable and credit line, and accrued expenses.

In the March 2–3, 1993 entry, the Applicant bills four hours for such services. Then without giving reasons for the time difference, on July 29, 1993, Applicant bills two hours for the same services, and on January 18, 1994, Tobin bills 4.75 hours for similarly described services. We are also concerned with time billed for preparation of the monthly cash flow statements. (See entry of 3/26–3/27/93, 9.5 hrs.; 6/15–6/16/93, 4.75 hrs.; 7/29/93 1.5 hrs.; 10/8/93, 1 hr.; 12/8/93, 2 hrs.) In light of these inadequate and inconsistently documented entries, we find that the balance of the request should be reduced by twenty-five percent, because it is "impossible to evaluate the reasonableness or necessity of such services," based on the information provided. *In re Smuggler's Beach Properties, Inc.,* 149 B.R. 740, 745 (Bankr.D.Mass. 1993); *see also Swansea,* 155 B.R. at 33.

Based upon the foregoing discussion and analysis, Tobin's application for compensation is ALLOWED in the total amount of $23,180.[6]

Accordingly, Tobin & Company is ordered to disgorge the amount it has received in excess of its pro-rata distribution, said sum to be calculated by the Trustee in accordance

---

**6.** $57,233 less $16,033.50 (prior to employment), less $4,590 (computer services), less $3,217 (du-plicative service), less $2,485.25 (conflict) = $30,907, less 25% ($7,727) = $23,180.

with our findings and directions herein, and pursuant to the provisions of the Code. *See* 11 U.S.C. § 726(b).

Enter Judgment consistent with this opinion.