**In re BIG RIVERS ELECTRIC CORPORATION, Debtor.**

**Bankruptcy No. 96–41168(11).**

United States Bankruptcy Court,
W.D. Kentucky,
Louisville Division.

April 5, 1999.

Michael A. Fiorella, Felicia S. Turner, Sullivan, Mountjoy, Stainbeck & Miller, Owensboro, KY, Mark S. Kaufman, Laura F. Nix, Russell A. Tolley, R. Allen Wilson, Ronald L. Presser, E. Louis Johnson, Paul Keck, Patrick A. Shoulders, Wm. Michael Schiff, Gregory G. Meyer, Mary Lee Franke, Robert L. Burkart, Long, Aldridge & Norman, Atlanta, GA, for Big Rivers.

James G. Bruen, Jr., Genevieve Holm, U.S. Dept. of Justice, Civil Division, Comm. Lit. Branch, Washington, DC, for, Rural Utilities Service.

Mark Thompson, Scott W. Brinkman, Frank P. Doheny, Jr., Mike Grady, Simpson, Thacker & Bartlett, New York City, for Chase Manhatten Bank.

Jeffrey L. Tanenbaum, Michelle A. Levitt, Joan Cooper, Barbara Edelman, Weil, Gotshal & Manges, Luoisville, KY, for Bank of New York.

Joseph J. Golden, Scott Goldberg, Louisville, KY, for U.S. Trustee.

David C. Brown, W. Robinson Beard, Allison Wade, Louisville, KY, David H, Kleiman, James P. Maloy, Dan Peek, Dann, Pecar, Newman & Kleiman, Indianapolis, IN, for Alcan Aluminum Corp. & Southwire Co.

Charles W. Ritz, III, Alan C. Stout, Parr, Richey, Obermskey & Morton, Indianapolis, IN, for Coops.

Richard C. Josephson, Stoel Rives, Portland, OR, William R. Renner, Lexington, KY, for Pacificorp.

J. WENDELL ROBERTS, Bankruptcy Judge.

"...Everyone thirsteth after gain...." (Sir Edward Coke, Institute of Lawes of England, Volume 3, 1628–1641). No truer statement could be made about the bankruptcy case of Big Rivers Electric Corporation. Those involved in this case-Big Rivers, its governmental and commercial creditors, the purchasers of its energy and all of the many professionals rendering services to it-have been eager to maximize their gain. At the very sunset of this case, the Court is faced with the thirst of gain and is charged with the duty of reviewing and awarding fees and expenses.

Historically through the centuries, society has developed economic systems, and various members of society-employers, parents, spouses, as well as one's own self-control-engage in a series of checks and balances on the use of time and the expenditure of money. Employees of a corporation answer to the Officers, who answer to the Board of Directors, who ultimately have responsibilities to the shareholders. But under Kentucky's political system which generally allows utility companies to recover its full costs of doing business from its users without much constraint, one must wonder if those in power of a not-for-profit utility answer to anyone. Such has obviously been the case of Big Rivers Electric Corporation ("Big Rivers") in its financial dealings over the past several decades.

Big Rivers is a non-profit public utility headquartered in Henderson, Kentucky and serves approximately 90,000 rural consumers in 22 counties in Western Kentucky, as well as certain huge commercial users. It is owned by four co-ops—

Henderson Union R.E.C.C., Jackson Purchase R.E.C.C., Meade County R.E.C.C. and Green River R.E.C.C. While Big Rivers is owned by these co-ops, it's strange that they appear to have little, if any, control over the activities of Big Rivers.

Many years ago, Big Rivers proposed a plan to the Kentucky Public Service Commission ("KPSC") for permission to construct the D.B. Wilson Power Plant. Big Rivers inaccurately estimated the cost of the power plant and when it was ultimately completed several years later, it was many millions of dollars over projected cost. By that time, the debt of Big Rivers had grown to nearly two billion dollars and in order to service the debt, a rate increase became imperative. However, the politically appointed Commissioners of the KPSC had changed and the new people in power refused to approve rates sufficient to enable Big Rivers to service the debt.

The problem was compounded throughout this time frame, as well as thereafter, by the fact that Big Rivers had been and continued to be engaged in a perpetual spending binge. The Board was responsible for making decisions concerning hundreds of millions of dollars each year, but none of the board members were experienced in money management of that magnitude. The waste in which Big Rivers engaged in its expenditures for goods and services was common knowledge throughout western Kentucky. It had an airplane, although very few of the counties it served had an airport.

A further example of its wasteful spending habits is witnessed in the advertising budget. Although Big Rivers had only one commodity to sell—electricity—and a captive market of consumers, it threw fifty thousand dollars to the winds each month by hiring a public relations firm which did such things as sponsor the University of Kentucky basketball games on the radio stations throughout western Kentucky. While any die-hard Wildcat fan, such as the undersigned, is reluctant to be critical of the sponsorship of Kentucky basketball games, it's apparent that the need of a monopoly to advertise is totally nonexistent.

It is with that mind-set, or corporate culture as it's now known, that the powers that be of Big Rivers dealt with money. It had over eight hundred employees, and its owners, the co-ops, had numerous employees; consequently, many of its customers had a relative on the payroll. All of the jobs were good, high-paying jobs for the work being performed. A casual observation reflected there was a lot of non-productive, or goof-off time.

Big Rivers and its co-ops were always active in community affairs. It sponsored county fairs, beauty pageants and free barbecues. It provided good service to the rural consumers, who enjoyed all of the seemingly freebies that were available under the sponsorship of Big Rivers. Unfortunately, few consumers realized that their rates for electricity were among the highest in the State of Kentucky. Even fewer realized that despite the exorbitant rates, Big Rivers was not able to pay its major creditors.

In 1984, the Rural Utility Services (the "RUS"), an agency of the Federal Government funded by the taxpayers of America, grew tired of not being paid on its note and mortgage, and it filed a foreclosure action in the United States District Court in Owensboro, Kentucky. At that time, nearly two billion dollars was owed by Big Rivers to the government—two billion dollars it had borrowed from the taxpayers of this Nation and because of its lack of constraint in spending money, was unable to repay when due. Ultimately, the foreclosure case was settled by a reduction in the debt and a modification of the mortgage terms, all to the detriment of the taxpayers.

Spending continued to run amuck, and in 1987, the RUS again restructured and modified the debt owed by Big Rivers. Over the next decade, the expensive redundancy of having four local co-ops, plus

the Big Rivers Corporation, continued unchecked. Coal contracts were entered into as a result of bribery and criminal activities. The Board's control of its general manager was so lax that he got away with taking criminal bribery for several years, a fact which may have been known by certain high-ranking professionals but not disclosed to the Board for a substantial period of time. When it became apparent that the house of financial cards of Big Rivers was soon to tumble, it gathered a group of high-paid professionals and in the year preceding the filing of bankruptcy, it spent over twenty million dollars on professional fees.

A sterling example of the frivolous expenditure on legal fees was the inordinately excessive amount of research engaged in by the attorneys on the limited issue of the possible appointment of a Chapter 11 trustee. Although such an event is rare, a review of the billings for the twelve month period preceding the filing of the bankruptcy reflects substantial importance being attributed to that matter. In fact, it appears on 11 of the 12 monthly billings. One is left to ponder: did all of the computers crash and research vanish, or did the attorneys think there were mountains of new cases decided on a monthly basis concerning trustees in Chapter 11, or what exactly was going on!? One thing is clearly obvious, the professionals had garnered a goose that continued to lay golden eggs and there was apparently no incentive to use any restraint in any facet of the professional representation.

It's with that backdrop that the Court now approaches the review and award of professional fees during the bankruptcy matter.

The Court understands that for several months preceding the filing of the bankruptcy, Big Rivers' professionals updated their computerized bankruptcy petition and schedules every Monday for they never knew in which week the filing would occur. In fact, their billings reflect the compiling of "first day filing package regarding petition, schedules and statements of financial affairs" as early as January, 1996. The Court was also aware of huge fees that were requested in a companion case—the bankruptcy case of Green River Coal Company ("Green River"). In fact, on the very day Big Rivers filed its bankruptcy action, an emergency hearing was held in Paducah, Kentucky, with a courtroom nearly filled with lawyers and other professionals. The undersigned explained to those present that September 25, 1996 was a significant day. It represented the first day of the bankruptcy existence of the debtor-in-possession. Fiduciary duties arose the instant the case was filed and those duties entailed the need to curtail expenses in an effort to maximize recovery by creditors. The mind-set of the corporation had to be changed. While historically they had spent money as if it were free water, they were now under the watchful eye of the Court and, although all of the attorneys were well versed in the requirements of the Bankruptcy Code, the Court emphatically explained that it would not permit the professional fees in this case to get out of hand.

At the next hearing in the Big Rivers' matter, on October 2, 1996, the Court considered the applications to employ ten different groups of professionals. Applications had been filed to employ four law firms and five consultants. Big Rivers even wanted to continue its public relations contract at the rate of fifty thousand dollars per month. Counsel were reminded by the Court that they had been instructed in Paducah that this case was "to be cost efficient." The question was posed as to whether Big Rivers had taken the instructions seriously. In that one brief week between the filing of the case and the second hearing, a mountain of documents which filled five file folders had been filed by the parties and reviewed by the Court. Very deep within an exhibit attached to a cash collateral motion was information that Big Rivers intended to buy brand new 1997 Ford LTD Crown Victorias for each

of its department heads during its first year in bankruptcy. Additionally, it wanted to continue to broadcast Wildcat basketball games. Thus, it quickly became apparent that the mind-set of Big Rivers had not yet been altered relative to the spending of money.

In an effort to contain costs, the Court imposed rather conservative limitations on the recovery of costs for each professional. The Court had already seen in the companion case of Green River that professionals sought reimbursement for the cost being transported by limousines to the airport, and for flying first-class from Pittsburgh to Louisville for the mere purpose of personally hand-carrying pleadings to the Court for filing. Such would not be tolerated in the Big Rivers' case. Shock was observed on the faces of some of the professionals when they were informed that the Court believed the United States mail service to be an acceptable mode of transporting documents to the courthouse, and encouraged its use, rather than the expense of private courier. Reimbursement for the cost of copies was limited to ten cents a page. No limit was put on the professionals' consumption of exotic meals or their housing in luxury hotels, but they would be limited in the amount they could bill Big Rivers to the Federal Government per diem rate. As the two law firms had at least a half dozen lawyers present at that hearing, they were instructed that in the future all unnecessary duplication would be avoided.

Pre-petition, Big Rivers had negotiated feverishly, the Court was told, to strike a bargain with PacifiCorp Energy Corporation ("PKEC"), an Oregon-based utility company. That contract was to be the "cornerstone" of the plan of Big Rivers and an agreement had been reached with many of its creditors. The Court soon learned that no agreement had been reached with Green River which had a claim of over 100 million dollars or with Chase Manhattan Bank or Bank of New York which collectively had unsecured claims of over 100 million dollars. So in reality, the only real agreement that Big Rivers had reached was with the RUS and the constituency, a term used by Big Rivers' professionals to describe its commercial customers and the co-ops. The reason no agreement had been reached with the banks was very clear—they would receive nothing under the proposed plan.

Within the first month following the date of filing, both banks filed motions for the appointment of a trustee. Another disgruntled unsecured creditor, Bluegrass Containment, filed a Motion for a Trustee or, in the alternative, for the Appointment of an Examiner.

The reported public utility bankruptcy cases reflect a general pattern of conduct that the parties litigate for years and years, sometimes for greater than a decade, and that the attorney fees expended fall in the range of twenty million to ninety million dollars and upwards. The parties soon learned that Big Rivers would not be permitted to languish in this Court as the other utility companies had done in other courts.

The Court was concerned about such an early trustee appointment, although in retrospect the Court is convinced that would have been the far better decision. However, much to the surprise of Big Rivers, the Court did enter an Order on October 16, 1996, directing the United States Trustee to name an Examiner in this case. In the order appointing the Examiner, the Court charged the Examiner with duties far in excess of the usual duties found in 11 U.S.C. § 1106(b). Importantly, the Examiner was instructed to use his best efforts to obtain a global settlement of all issues in this case. A Trustee could have bypassed most of these issues by merely scheduling an auction and selling all the assets of Big Rivers to the highest and best bidder.

By February, 1997, the Examiner reported to the Court that inquiries had been received from other potential suitors

of Big Rivers and that Big Rivers would not respond other than to say that it was not interested. The Court scheduled a hearing where pleas were heard from Big Rivers, the co-ops and the RUS in favor of the PKEC deal. They skillfully skirted the issue as to why Big Rivers wanted the PKEC deal, arguing strenuously it was the best deal that could ever be obtained. In fact, Al Robison, an overpaid professional under contract with Big Rivers, bombastically testified that it would be a "travesty" and "it would be in the worst possible interest of the creditors, of the members, of the cooperatives of Big Rivers and of the employees" for the Court to look beyond the PKEC deal. The infamous "No Shop Clause" was not disclosed to the Court at that hearing.

The banks were properly focused and pushed for opening the matter to an auction as proposed by the Examiner. The most curious advocacy of the entire hearing was that of the RUS. Remember, the RUS had been dealing with Big Rivers, trying to get paid on its note, since 1984—well over ten years. Yet, its counsel stood in Court that day and expressed total satisfaction with the PKEC deal, even though some other bidder might be willing to pay more money. To say that the RUS argued for the PKEC deal would be an understatement. Ironically, it was the RUS who would stand to benefit from a better offer.

At the end of the hearing, the Court ordered a "bidding procedure" to occur during a very limited time period. Initially several bonafide bidders expressed interest, including Enron Energy Corporation, East Kentucky Power and Louisville Gas and Electric Company ("LG & E"). The Court allowed only a short timetable in which the bidders could conduct due diligence and purportedly that caused Enron to abandon its interest. East Kentucky Power tendered its deposit for $100,-000.00 for the right to bid, only to learn that its mortgagee-the RUS-refused to even consider its request for authority to bid. It seems that under the terms of the

loan documents between East Kentucky Power and the RUS, the RUS would have to give authorization to East Kentucky before it could make major purchases. The same counsel that urged the Court to approve the PKEC deal also told the Court that the RUS wouldn't even look at the proposal by East Kentucky because it didn't have time to wander through the bureaucratic red tape. So the "bidding procedure" was left with only two potential bidders-PKEC and LG & E.

PKEC did not bid, but to the elation of the banks, the chagrin of PKEC, and the rather ambivalence of Big Rivers and the RUS, Louisville Gas and Electric Co. lodged a bid which was between 70 million and 120 million dollars more for the lease of Big Rivers' assets than PKEC initially had agreed to pay.

From that point in time, Big Rivers substituted LG & E in its amended plan and rapidly obtained an agreement with the banks which would now be paid approximately 90% of their unsecured claims. Ultimately, the Examiner proved instrumental in achieving a settlement between Big Rivers and Green River. The amended plan also provided for enhanced payments to the RUS and rate reductions for the smelters and rural consumers.

Less than ten months after the case was filed, even with the obstacles thrown in the path by the "No "Shop Clause" ", the amended plan of Big Rivers had been confirmed by the Court. After confirmation, the parties filed for the necessary regulatory approval with the KPSC and the Federal Utility Regulatory Commission. Although the agreement ultimately reached in this Court had consumed most waking moments of the many professionals for ten months, and had been hammered out by all parties concerned only after extensive negotiations, costing millions of dollars, the KPSC raised questions that put the parties back on a path to war. For a time it looked as though all of the efforts and all of the millions of dollars had simply been blown apart by the KPSC. After the anger

subsided, the Examiner was able to negotiate an agreement between the parties which provided a rate structure that met with the KPSC's approval. Nearly a year was lost in the resolution of the case because of that problem.

Even with the many problems, each one of which looked insurmountable at the time, this utility case established new records of speed from filing to confirmation to consummation. All matters have been resolved either by the parties or by the Court, except the matter presently before us.

The Court is now called upon to conduct its final review of the professional fees and expenses for which the various professionals seek compensation and reimbursement. Having already approved the fees and expenses of Jeffrey M. Sanders; Zeimer, Stayman, Weitzel & Shoulders; and Wilson, Johnson & Presser, all of which the Court found commendably stayed within the billing guidelines established in this case, the Court now turns its attention to the applications of professionals which have failed to be as compliant.

The Court has found that the applications for professional fees and expenses fall into two categories: (1) those that include billings, and expenses for PKEC-related matters; and (2) those that do not. Those falling within the parameters of the first category are: (a) Arthur Anderson, LLP ("Arthur Anderson"), which seeks fees of $1,169,118.50 and expenses of $12,-709.75; (b) Wheeler Peak Consulting Corporation ("Wheeler Peak"), which seeks fees of $580,231.20 and expenses of $171,-275.14; (c) The Brattle Group, which seeks fees of $489,993.75 and expenses of $37,-243.77; (d) Long, Aldridge & Norman ("LAN"), which seeks fees of $6,713,240.05 and expenses of $536,726.63; (e) Utility and Economic Consulting, Inc. ("UEC"), which seeks fees of $173,762.50 and expenses of $12,784.08; and (f) Sullivan, Mountjoy, Stainback & Miller ("SMSM"), which seeks fees of $2,243,411.90 and expenses of $248,901.73. There are only two

remaining Applicants that fall into the second category (i.e., those whose bills do not include PKEC-related matters): (a) Willamette Management Associates ("WMA"), which seeks fees of $205,831.75 and expenses of $10,457.96; and (6) Orrick, Herrington & Sutcliffe, which seeks fees of $859,582.25 and expenses of $43,913.01.

No party in interest has objected to the allowance of these fees except the Chase Manhattan Bank and the Bank of New York, and while each advanced substantive objections, the primary focus is on the ability of Big Rivers to pay all final fees that may be awarded. Unless the payment would impede the ability of Big Rivers to pay the banks the amount each agreed to accept, these creditors really do not wish to pursue their objections.

The fees incurred by the various professionals are exorbitant and one would anticipate objections by certain parties in interest. First of all, the co-ops are the real owners of Big Rivers and they are on the front line between the customers, on the one hand, and the supplier of electricity, on the other. The containment of costs, one would think, would benefit the ultimate users by way of a rate reduction. In fact, at this precise time, two of the co-ops—Henderson Union RECC and Green River RECC—have entered into a consolidation agreement and are encouraging a majority vote of its member-owners in favor of a consolidation. They state an annual savings of 1.75 to 2.2 million dollars will be realized after the efficiencies of a consolidation are in place. It will also result in improved customer service, they say. The Court notes with dismay that a similar proposal failed to pass last year.

The fees awarded have a direct impact upon the RUS, yet it found no reason to object. Probably it knew of the "No Shop Clause" in the PKEC deal which it strongly advocated. Obviously, the importance of money escapes the RUS, since, after all, it operates with taxpayer dollars rather than with its own money as the other

creditors do. The RUS certainly attacked the request of the Examiner for an enhanced fee with venom. Perhaps it bit the Examiner so hard that it didn't have the energy to bite Big Rivers' professionals.

The Court has already described the incorrigible habit of Big Rivers for expending exorbitant sums unnecessarily, so it is not surprising at all that Big Rivers filed no objection to the professional fees it must pay even though huge sums were charged for services that yielded no benefit to the Debtor–In–Possession's estate.

The only other party-in-interest that causes the Court some surprise by its failure to object is the United States Trustee. Like the RUS, the U.S. Trustee focused all of its efforts on the Examiner, and apparently, is willing to let millions of dollars go unchallenged to the various professionals, again without regard to whether or not the work benefitted the estate.

Even though no party-in-interest seriously objected to the fees of Big Rivers' professionals, the Court has a duty to carefully scrutinize them. The Court must now engage in the very unpleasant task of cutting fees, for the reasons hereinafter articulated.

### LEGAL ANALYSIS

The analysis for awarding compensation to a professional begins with 11 U.S.C. § 330(a). That section provides:

(a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to Sections 326, 328, and 329, the Court may award to a trustee, an examiner, a professional person employed under Section 327 or 1103–

(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B) reimbursement for actual, necessary expenses.

■ The Bankruptcy Court plays a significant role in protecting the assets of the bankruptcy estate in order that they be maximized for the benefit of the creditors. *In re Copeland,* 154 B.R. 693, 697 (Bankr.W.D.Mich.1993); *In re Red Cross Hosp. Assoc., Inc.,* 18 B.R. 593, 595 (Bankr.W.D.Ky.1982). To that end, the Bankruptcy Court bears responsibility for insuring that estate assets are not wasted. *Copeland,* 154 B.R. at 697; *In re Huhn,* 145 B.R. 872 (W.D.Mich.1992). In executing this responsibility, it is incumbent upon the Bankruptcy Court to independently review all fee applications submitted by professionals desiring to be paid fees from the estate in an effort to determine whether the fees requested are in compliance with § 330(a). *In re J.F. Wagner's Sons, Co.,* 135 B.R. 264, 266 (Bankr.W.D.Ky.1991); *In re Bush,* 131 B.R. 364 (Bankr. W.D.Mich.1991).

■ Section 330(a) requires that requested fees meet three criteria. They must be: (1) reasonable; (2) incurred for services that were actually rendered; and (3) incurred for services that were necessary. To enable this Court to determine whether requested fees meet these criteria, fee applicants are required to submit a professional fee application that, at a minimum, adheres to the following guidelines:

(1) Recites the date of entry of the order of the Bankruptcy Court approving the employment of the individual or firm for whom payment of fees and/or expenses is sought and the date of the last fee application for that professional;

(2) Recites the amount of fees and expenses previously requested and approved by the Court. If payment has been received, the date, the amount and source of funds and the disclosure of any prepetition advance against fees which was not earned prior to the filing of the petition;

(3) Recites brief biographies of all persons employed as professionals or paraprofessionals;

(4) Professionals and paraprofessionals should be utilized in such a way as to minimize the cost to the estate.

(5) Out-of-state professionals should include proof of the customary fees in their local professional community;

(6) Attachment of a statement of the amount presently sought and a schedule of appropriate billing rates for each individual whose services are the subject of the application;

(7) Computation of the compensation of each individual by multiplying the time spent by the appropriate billing rate ("lodestar method");

(8) If a "lodestar" adjustment is sought, the Applicant shall provide the Court with a separate analysis of the facts upon which such adjustment is claimed, together with the amount of the proposed adjustment;

(9) A summary itemizing all expenses by category;

(10) Detailed entries for the time work is performed, setting forth: date, description of services, parties, documents, research (nature, purpose and necessity), detail of unusual items, and time spent; and

(11) Overhead expenses shall not be included in the fee applications. Secretarial work, overtime and word processing costs are not generally compensable. *In re Belknap, Inc.*, 103 B.R. 842 (Bankr. W.D.Ky.1989); *In re Navis Realty, Inc.*, 126 B.R. 137 (Bankr.E.D.N.Y.1991).

With these guidelines in mind, the Court will first address the two Applications that do not involve fees and expenses for PKEC-related matters: (a) Wilamette Management Associates; and (b) Orrick, Herrington, and Sutcliffe. These Applications do not raise the troubling issues attendant with the inadequate, unsatisfactory, and frankly unacceptable PKEC plan so devotedly promoted by Big Rivers and its professionals as Big Rivers entered into

bankruptcy and for the next several months thereafter. The Court will separately discuss the Applications which include billing for PKEC-related matters thereafter. These Applications will be addressed as a group as the Court's comments and findings apply with equal force to all work performed in that vain, regardless of the identity of the particular Applicant.

## I. NON–PKEC–RELATED APPLICATIONS.

### A. WILAMETTE MANAGEMENT ASSOCIATES.

Wilamette Management Associates ("WMA") has filed its Final Application for Allowance of Fees and Expenses, covering the period of September 25, 1996 through July 17, 1998. The verified Application seeks compensation for professional services rendered in the sum of $205,831.75 and expenses in the sum of $10,457.96.

The Court has fully reviewed not only the Final Fee Application presently before it, but the two previous Interim Fee Applications with supporting documentation submitted by WMA. The Court finds that WMA's Applications fail to comply with the fee application requirements set forth in detail above in the following ways: (1) WMA's billing records omit detailed description of services rendered for a significant portion of the billing period; (2) WMA's billing sheets include many telephone calls of excessive length in duration without explanation as to the necessity thereof; (3) there are several instances of excessive and unnecessary services; and (4) there are some questionable expenses for which WMA seeks reimbursement. These areas of noncompliance are addressed in greater detail, as follows:

### 1. OMISSION OF DETAILED DESCRIPTION OF SERVICES RENDERED.

WMA billing records omit detailed descriptions of services rendered for the en-

tire period of October 1, 1996 through February 14, 1997. Additionally, detailed descriptions are omitted from many of the entries from February 15, 1997 through February 28, 1997. The WMA billing records for these periods contain only general, vague descriptions of the services rendered; such as, "Research/Analysis," "Review/Analyze Company documents," "Computer Search," "Conference," "Meet/Phone," and "Travel." The entries do not explain the nature or purpose of the "research," "computer search," or "analysis." They do not explain with whom the "conferences" were conducted, or the nature, purpose, or location thereof. The same is true with the "meetings" and "phone calls" referenced in the time sheets. Lastly, the "travel" entries do not include any explanations with regard to the location to which the Applicant traveled, or the need or purpose thereof.

WMA seeks fees in the amount of $96,-344.25 and reimbursement of expenses in the amount of $6,274.99 for this period. Without detailed entries, the Court cannot evaluate the reasonableness and necessity of the services rendered and the fees sought.

## 2. TELEPHONE CALLS OF EXCESSIVE LENGTH IN DURATION.

WMA's billing records include many telephone calls of excessive duration. Unfortunately, these entries simply fail to offer any explanation for the reason or necessity for telephone calls repeatedly ranging from one to four hours in length. The Court notes, specifically, the following entries under the description "Meet/Phone":

| Date | | Hours billed |
|------|---|------|
| 10/15/96 | - | 4.00 |
| | | 2.50 |
| | | 1.00 |
| 10/26/96 | - | 1.00 |
| 11/1/96 | - | 7.00 |
| 11/7/96 | - | 2.00 |
| 11/8/96 | - | 2.00 |
| 11/12/96 | - | 1.00 |
| 1/29/97 | - | 3.00 |

| Date | | Hours billed |
|------|---|------|
| 2/2/97 | - | 1.00 |
| 2/4/97 | - | 2.00 |
| 2/5/97 | - | 1.00 |

Moreover, WMA's billing records contain numerous entries for excessively long telephone calls. While these entries are a bit more descriptive in terms of to whom the telephone calls were placed and the individuals included, they still fail to provide an explanation for their excessive length. These include the following entries:

| Date | | Hours billed |
|------|---|------|
| 4/25/97 | - | 1.00 |
| 4/28/97 | - | 1.50 |
| 4/29/97 | - | 1.50 |
| 6/3/97 | - | 2.30 |
| | | 1.80 |
| 6/4/97 | - | 1.00 |
| | | 1.00 |
| 6/6/97 | - | 1.40 |

The Court simply cannot determine the reasonableness or necessity of such telephone calls from the documentation that has been tendered.

## 3. EXCESSIVE AND UNNECESSARY SERVICES.

The Court's review of WMA's billing records has revealed significant instances of excessive and unnecessary services for which fees are sought. The Court specifically notes the following entries.

First, the WMA billing records reveal that three members of the Applicant firm billed time for reading industry articles. In this category, Jan D. Tudor billed four hours at an hourly rate of $70.00, Robert P. Schweihs billed 2.4 hours at an hourly rate of $275.00, and Tom Millon billed 15.6 hours at an hourly rate of $225.00. The Court notes that reading industry articles is necessary for a professional to stay current within his or her area of expertise. It is not, however, a professional service that should be billed to a client. It is a basic activity in which all professionals must engage in order to maintain one's professional status.

Second, the Court notes that on April 25, 1997, two hours were spent drafting a

memo summarizing a one hour telephone call.

■ Third, on May 12, 1997, Tom Millon billed 3.5 hours at an hourly rate of $225.00 critiquing the work of B. Davis. While training and reviewing the work of associates and new professionals are necessary functions, the costs associated therewith are expenses to the firm. They should not be born by its clients. Clients expect and are entitled to a certain level of expertise. It is up to the professional firm to train and oversee its staff in order to provide that level of service.

Fourth, on May 13, 1997, Tom Millon billed 2.5 hours, again at his hourly rate of $225.00, to reorganize work papers and exhibits. This represents a complete failure to properly utilize professional and paraprofessional services so as to minimize the cost to the bankruptcy estate. This service could have been much more cost-efficiently performed by paraprofessional support staff, at a fraction of the hourly rate charged by Mr. Millon.

### 4. EXCESSIVE EXPENSES.

Lastly, the Court finds several of WMA's expenses to be questionable. First, WMA has included several hotel expenses for staying at the McLean Hilton in McLean, Virginia. There is a charge of $486.00 for S. Moore for a three night stay, October 22, 1996 through October 24, 1996 (at an average cost of $162 per night). There is also a $648.00 charge for S. Moore for a four night stay, October 28, 1996 through October 31, 1996, at the same hotel (at an average cost of $162 per night). Yet, S. Moore stayed at the same hotel for two nights the next week, on November 6, and 7, 1996, for a total cost of only $136.32 (or $68.16 per night). While there may be a perfectly logical explanation for this discrepancy, one has not been presented to the Court.

All professionals in this case have been limited by Court Order dated October 3, 1996, to the locality per diem limits imposed upon the Judiciary. Paragraph 7 of the October 3, 1996 Order reads:

7. Travel charges.

First class air fare, luxury accommodations and deluxe meals are not reimbursable, nor are personal, incidental charges such as telephone and laundry. Actual costs for lodging and meals are reimbursable, provided however, the per diem cost shall not exceed that allowed the Judiciary by the Administrative Office of the United States Courts (Per diem rate for Louisville, Kentucky—$94.00 per day; Owensboro, Kentucky—$73.00 per day).

The Court has reviewed the per diem guidelines for Virginia. As McLean is not specifically listed, the general per diem applies-$73.00 per day. Thus, the $162.00 per night for the McLean Hilton claimed for S. Morris's two separate stays exceeds the allowed amount.

### 5. REDUCTION OF WMA'S FEES AND EXPENSES.

■ As a result of the above-stated problems with WMA's request for fees and expenses, this Court by Separate Order shall impose a 50 percent across the board reduction in the fees for services and expenses incurred for the period covered by the Application. Applicant requests fees for services totaling $205,831.75 and reimbursement of expenses in the amount of $10,457.96. These amounts total $216,-289.71. Thus, a 50 percent reduction will reduce Applicant's recovery to $108,144.86.

### B. ORRICK, HERRINGTON & SUTCLIFFE.

Orrick, Herrington & Sutcliffe ("OHS") has filed its Final Application for Allowance of Fees and Expenses, covering the period of February 4, 1997 through July 17, 1998. The verified Application requests Compensation for professional services rendered in the amount of $859,-582.25 and expenses in the sum of $43,-913.01.

The Court has fully reviewed not only the Final Fee Application presently before it, but the four Interim Fee Applications with supporting documentation previously filed by OHS. Based on this review, the Court finds that OHS's Applications fail to comply with the fee application requirements set forth in detail above in the following ways: (1) OHS's billing records are replete with instances of double-billing, where two or more OHS attorneys each billed for the same office conference, telephone conference, or attending the same meeting; (2) there are instances of billing for services that are overhead or secretarial in nature; (3) there is an excessive amount of time spent on the preparation of bills, especially when compared to the amount of time spent on substantive matters before the Court; and (4) there is at least one questionable expense for which OHS seeks reimbursement. These areas of noncompliance are addressed in greater detail, as follows:

## 1. DUPLICATION OF SERVICES.

The Court has reviewed OHS's billing records and finds that they are replete, from beginning to end, with instances of two or more OHS attorneys participating in in-office conferences for which all or most of the attorneys billed time and instances of two or more OHS attorneys attending and participating in the same client meetings, hearings, and conferences with co-counsel, opposing counsel, and other professionals. The Court has compiled the following list of examples of the date and billing time totals recorded where such entries occurred. It should, however, be noted that the list is not exhaustive. Rather, the following merely represents samples taken at random throughout OHS's billing records:

| Date | Professional | | Hours Billed |
|------|-------------|---|--------------|
| 2/12/97 | Gottlieb | - | .9 |
| | Lyon | - | .9 |
| 2/13/97 | Gottlieb | - | 7.0 |
| | Lyon | - | 7.0 |

| Date | Professional | | Hours Billed |
|------|-------------|---|--------------|
| 2/18/97 | Gottlieb | - | 2.1 |
| | Lyon | - | 2.1 |
| 2/21/97 | Lyon | - | .9 |
| | Gottlieb | - | .1 |
| | Drefke | - | 1.0 |
| 3/16/97 | Gottlieb | - | .3 |
| | Lyon | - | .4 |
| 4/2/97 | Gottlieb | - | 2.10 |
| | Reynolds | - | 5.0 |
| | Lyon | - | 4.5 |
| | Nichols | - | 1.0 |
| 4/10/97 | Lyon | - | .3 |
| | Gottlieb | - | 1.9 |
| | Wolk | - | .5 |
| 4/11/97 | Reynolds | - | 1.0 |
| | Lyons | - | 1.0 |
| 4/18/97 | Gottlieb | - | .9 |
| | Lyon | - | 1.0 |
| 4/21/97 | Gottlieb | - | .5 |
| | Lyon | - | .5 |
| 5/5/97 | Gottlieb | - | .6 |
| | Lyon | - | .6 |
| 5/22/97 | Gottlieb | - | .5 |
| | Cardall | - | .5 |
| | Lyon | - | .2 |
| | Nichols | - | .5 |
| 5/30/97 | Gottlieb | - | 1.2 |
| | Lyon | - | .9 |
| 6/2/97 | Lyon | - | 2.5 |
| | Gottlieb | - | 1.7 |
| 7/17/97 | Wolk | - | .5 |
| | Gottlieb | - | 3.9 |
| | Lyon | - | .7 |
| 9/30/97 | Gottlieb | - | 1.2 |
| | Lyon | - | 1.0 |
| 10/1/97 | Lyon | - | 1.3 |
| | Gottlieb | - | 1.3 |
| 10/28/97 | Drefke | - | 7.5 |
| | Gottlieb | - | 7.5 |
| 10/29/97 | Drefke | - | 7.0 |
| | Gottlieb | - | 7.0 |
| 10/30/97 | Drefke | - | 5.5 |
| | Gottlieb | - | 5.5 |

| Date | Professional | | Hours Billed |
|------|-------------|---|-------------|
| 12/9/97 | Gottlieb | - | .7 |
| | Wolk | - | .4 |
| | Lyon | - | .3 |
| 12/10/97 | Mitchell | - | .2 |
| | Gottlieb | - | 1.7 |
| | Wolk | - | .3 |
| | Nichols | - | .3 |
| | Lyon | - | 1.5 |
| 1/28/98 | Gottlieb | - | .4 |
| | Wolk | - | .4 |
| 2/16/98 | Gottlieb | - | 11.1 |
| | Lyon | - | 9.5 |
| 2/18/98 | Gottlieb | - | 1.5 |
| | Wolk | - | 1.4 |
| | Sobel | - | .1 |
| | Lyon | - | .2 |
| 3/11/98 | Ontiveros | - | 6.1 |
| | Drefke | - | 5.8 |
| | Gottlieb | - | 6.3 |
| 3/12/98 | Ontiveros | - | 5.5 |
| | Drefke | - | 4.5 |
| | Gottlieb | - | 4.9 |
| 4/1/98 | Simpson | - | .3 |
| | Ontiveros | - | 5.1 |
| | Drefke | - | 4.6 |
| 4/2/98 | Simpson | - | 3.7 |
| | Drefke | - | 1.8 |
| 4/14/98 | Gottlieb | - | .6 |
| | Lyon | - | .6 |
| 4/17/98 | Gottlieb | - | .4 |
| | Lyon | - | .4 |
| 5/15/98 | Drefke | - | .4 |
| | Gottlieb | - | .4 |
| 5/19/98 | Danzis | - | 12.1 |
| | Drefke | - | 13.7 |
| | Gottlieb | - | 6.9 |
| 5/20/98 | Early | - | 2.0 |
| | Danzis | - | 13.0 |
| | Drefke | - | 15.7 |
| | Gottlieb | - | 5.6 |
| | Lyon | - | .1 |
| 5/21/98 | Drefke | - | 5.6 |
| | Gottlieb | - | 3.1 |
| 6/10/98 | Gottlieb | - | .6 |

| Date | Professional | | Hours Billed |
|------|-------------|---|-------------|
| | Drefke | - | .6 |
| 6/23/98 | Gottlieb | - | 2.4 |
| | Drefke | - | 1.4 |
| | Nichols | - | .1 |
| 6/24/98 | Drefke | - | 1.7 |
| | Gottlieb | - | 1.7 |
| 7/8/98 | Drefke | - | 1.1 |
| | Mitchell | - | .1 |
| | Gottlieb | - | 2.6 |
| | Lyon | - | 2.4 |
| 7/9/98 | Drefkt | - | .8 |
| | Gottlieb | - | 1.8 |
| | Nichols | - | .5 |
| | Lyon | - | .7 |
| 7/10/98 | Drefke | - | 1.2 |
| | Gottlieb | - | 2.7 |
| | Wolk | - | .4 |
| | Lyon | - | 1.1 |

The Court additionally notes that the hourly billing rates for these individuals are as follows: (1) K. Drefke at $260; (2) S. Gottlieb at $340; (3) C. Lyon at $440; (4) T. Mitchell at $300; (5) R. Nichols at $400; (6) P. Ontiveros at $155; (7) L. Danzis at $155; (8) T. Simpson at $150; and (9) N. Wolk at $340. Accordingly, such duplication of services at rates such as these represents additional and unnecessary costs to the estate of an exorbitant amount.

The Court's October 3, 1996 Order expressly provides that a professional's presence at a meeting must be "necessary" to be compensable, and that where more than one professional from a firm attends a meeting, the presence of each additional professional must be necessary. Otherwise, "professionals shall be allowed to bill meeting time only at the hourly rate of the highest professional in attendance for each firm." No such necessity has been demonstrated in this case.

## 2. BILLING FOR SERVICES THAT ARE SECRETARIAL IN NATURE AND, THUS, OVERHEAD.

OHA has included at least four entries for services that are in the nature of secretarial and overhead expenses. On March 11, 1998, J. DeJesus billed .5 of an hour for

"distributing" copies of a restated mortgage. Second, there is an entry of .9 on May 19, 1998, by L. Danzis for "distributing" a remarketing circular to a working group. Third, on May 15, 1997, there is an entry of .4 by S. Gottlieb for "delivery of opinion relating to extension of [letter of credit]." Finally, OHS has billed 4 hours on December 9, 1997, for J. DeJesus's "preparation of distribution via telecopy of mortgage for S. Gottlieb."

These services are simply not compensable from assets of the bankruptcy estate.

### 3. EXCESSIVE EXPENDITURES FOR PREPARATION OF THE BILL.

In reviewing OHS's billing records, the Court is disturbed by the disproportionately large amount of time spent on preparation of the bill.

The Court notes that the billing time covered by the four Interim Fee Applications breaks down as follows:

A. 1st Interim Fee Application.
   (1) Possible Sale–Leaseback: $24,845.75.
   (2) Substitute Letters of Credit: $97,404.25.
   (3) Preparation of the bill: $3,542.50.
B. 2nd Interim Fee Application.
   (1) General: $158.00.
   (2) Possible Sale–Leaseback: $1,180.00.
   (3) Substitute Letters of Credit: $129,995.75.
   (4) Preparation of the bill: $4,160.00.
C. 3rd Interim Fee Application.
   (1) Possible Sale–Leaseback: $2,572.00
   (2) Substitute Letters of Credit: $144,189.00.
   (3) Preparation of the bill: $3,932.50.
D. 4th Interim Fee Application.
   (1) Possible Sale–Leaseback: $88.00.
   (2) Substitute Letters of Credit: $442,452.50.

(3) Preparation of the bill: $5,270.00.

It is apparent from this breakdown that during at least three of the four interim periods, more time was billed for "preparing the bill" than was spent in one or more of the categories of actual services provided. Additionally, the Court notes that the total amount billed for "preparing the bill" totals $16,905.00. This is simply unacceptable. Outside of the bankruptcy arena, a paying client would find it not only appalling, but abhorrent, to be billed $16,905.00 for being billed!

The Court directs the parties' attention to 11 U.S.C. § 330(a), which authorizes the Court to award reasonable compensation for "actual, necessary" services and expenses. "Under the dictates of § 330(a), the services and expenses must be 'both supplied to and beneficial to the estate.'" *In re Allied Computer Repair, Inc.,* 202 B.R. 877, 886 (Bankr. W.D.Ky.1996) (quoting *In re Lederman Enter., Inc.,* 997 F.2d 1321, 1323 (10th Cir.1993)). As this Court previously interpreted the § 330(a) requirements, "unless the services performed produced a demonstrable benefit to the estate, § 330 does not authorize the Court to award compensation." *Allied Computer,* 202 B.R. at 886; accord *Lederman,* 997 F.2d at 1323; *In re Amberg,* 148 B.R. 376, 377–78 (Bankr. D.Conn.1992); *In re Chas. A. Stevens & Co.,* 105 B.R. 866, 870 (Bankr.N.D.Ill. 1989); *In re Rhoten,* 44 B.R. 741, 743 (Bankr.M.D.Tenn.1984); *In re Roger J. Au & Son,* 114 B.R. 482, 487 (Bankr.N.D.Ohio 1990); *In re S & T Indus., Inc.,* 63 B.R. 656, 657 (Bankr.W.D.Ky.1986); *In re St. Vrain Station,* 151 B.R. 549, 552 (D.Colo. 1993); *In re Swansea Consol., Resources, Inc.,* 155 B.R. 28, 31 (Bankr.D.R.I.1993); *In re Waxman,* 148 B.R. 178, 181–82 (Bankr.E.D.N.Y.1992).

As this Court has previously made clear in the *Allied Computer* case:
   Attorneys must be disabused of the erroneous notion that they are entitled to compensation as long as the time re-

corded was actually expended. *Chas. A. Stevens*, 105 B.R. at 871; *Waxman*, 148 B.R. at 181. Simply put, billable hours do not necessarily translate into compensable hours. *Chas. A. Stevens*, 105 B.R. at 871; *Waxman*, 148 B.R. at 181. "Requesting and receiving authorization from the court to represent a debtor does not automatically guarantee the attorney that he or she will be paid from the estate for such services." *Waxman*, 148 B.R. at 181. As several courts have noted, the bankruptcy process is not designed "principally to serve as a fund for payment of professional fees." *Chas. A. Stevens*, 105 B.R. at 871; *Amberg*, 148 B.R. at 377–78; *Toney*, 171 B.R. at 415. Rather, one of its main purposes is to maximize the estate for distribution to the creditors. *Amberg*, 148 B.R. at 377–78; *Toney*, 171 B.R. at 415. As the *Chas. A. Stevens* Court aptly stated:

> The estate is not a cash cow to be milked to death by professionals seeking compensation for services rendered to the estate which have not produced a benefit commensurate with the fees sought.

105 B.R. at 872; Accord *Waxman*, 148 B.R. at 183. It must be remembered that "every dollar spent on legal fees results in a dollar less that is available to the estate and its creditors." *In re Rusty Jones, Inc.*, 134 B.R. 321, 333 (Bank[r].N.D.Ill.1991).

202 B.R. at 886. Accordingly, while expending time in the preparation of a professional's bill is obviously necessary to the billing process, and hence is integral to the provision of professional services, such expenditure does very little to enhance or benefit the bankruptcy estate. A professional must remain acutely aware of this fact when billing for such services.

For these reasons, the Court finds OHS's billing of $16,905.00 for preparing the bill unreasonable in amount.

### 4. EXPENSES.

Lastly, the Court finds one questionable expense on OHS's billing records. On August 31, 1997, there is an entry for which OHS seeks reimbursement of $800.09 for "business meals" for seven people. That breaks down to an average of $114.30 a person. The Court finds this to be excessive in amount.

Further, the entry does not state in which locality the meals took place. The October 3, 1996 Order restricts professionals from being reimbursed for out-of-town meals and lodging in amounts in excess of the locality per diem limits imposed upon the Federal Judiciary. While it is not possible to determine from OHS's billing records the locality of these meals, the Court suspects this expense runs contra to its October 3, 1996 Order.

### 5. REDUCTION OF OHS'S FEES AND EXPENSES.

As a result of the above-stated problems with OHS's request for fees and expenses, this Court shall by separate Order impose a 50 percent across the board reduction in the fees for services and expenses incurred for the period covered by the Application. OHS requests fees for services totaling $859,582.25 and reimbursement of expenses in the sum of $43,913.01. These amounts total $903,495.26. Thus, a 50 percent reduction will reduce OHS's recovery to $451,747.63. As OHS has already received $831,073.68, it is not entitled to further payment, but will be required to make a refund.

### II APPLICATIONS INCLUDING PKECRELATED MATTERS.

On September 15, 1996, when Big Rivers filed its bankruptcy action, it had already executed an agreement with PKEC. At that time, Big Rivers was faced with a litany of financial problems arising from a variety of factors, including, poor management, dishonest employees, unfavorable business conditions, and Big Rivers' default on its obligation to the RUS. In an

attempt to rectify some or all of these problems, Big Rivers spent numerous months prior to bankruptcy negotiating a long-term lease agreement with PKEC. The agreement was finally consummated one month prior to bankruptcy, and formed the basis for the Plan of Reorganization pursued by Big Rivers. Pursuant to the agreement, PKEC agreed to lease substantially all of Big Rivers' electrical generation plants and assets, provide power to Big Rivers' customers, and market any excess power. As the agreement was drafted in contemplation of Big Rivers' Chapter 11 Reorganization, it required, by its terms, the approval of the Bankruptcy Court.

At the outset of this bankruptcy action, Big Rivers filed a document with the Court entitled "Omnibus Declaration in Support of Big Rivers Electric Corporation's Chapter 11 Filing" ("Omnibus Declaration"). The document explained Big Rivers' financial woes, as well as its initial strategy for accomplishing a Chapter 11 Reorganization. The key component of Big Rivers' reorganization, as explained to the Court in that document, was the PKEC agreement. While the pertinent terms of that agreement appear to be explained in the Omnibus Declaration, one deleterious clause was suspiciously omitted—the "No–Shop Clause." That clause precluded Big Rivers from actively soliciting or even entertaining offers from other entities, thereby, tying Big Rivers' hands from negotiating a better offer that would maximize the assets of the estate. The roadblock created by this clause totally blocked Big Rivers in the fulfillment of its fiduciary duty to maximize the estate, a duty which is compelled of every Chapter 11 Debtor–in–Possession and a duty which is owed to the estate, its creditors, and, in this case, the utility customers, as well.

Instead of disclosing this clause, which clearly undermined the best interests of all interested parties except for PKEC, Big Rivers presented the PKEC agreement as its financial salvation, representing that it would achieve the highest cash flow, produce the best maximum value, and was the "best" offer that Big Rivers could possibly achieve. In fact, early in the case, Al Robison, Big Rivers' purported expert, testified in Court that no better plan could be developed. Mr. Robison did not, however, bother to disclose the No–Shop provision. Likewise, Big Rivers' other witnesses, professionals, and legal counsel remained mute with regard to the No–Shop Clause, despite the loquacious manner in which they discussed all of the other terms of the PKEC agreement in their spirited advancement of that transaction.

As subsequent events unfolded, it became readily apparent that the PKEC offer was not the "best" offer Big Rivers would receive for its assets. In fact, it was not even PKEC's final or best offer. Moreover, the No–Shop Clause was not discovered until better offers began to surface, which Big Rivers, in a seemingly illogical manner, refused to even entertain.

Specifically, shortly after Big Rivers filed its Disclosure Statement and proposed Plan of Reorganization on January 22, 1997, the cornerstone of which was the strenuously advocated PKEC agreement, LG & E approached Big Rivers with two proposals to lease or purchase substantially all of Big Rivers' assets. The value offered by these two plans exceeded that of the PKEC agreement by 37 million dollars and 57 million dollars respectively. In response, Big Rivers did an almost unimaginable thing-it rejected the undeniably superior LG & E offer. The Court finally became enlightened with the explanation for Big Rivers' self-defeating conduct as the No–Shop Clause for the first time came to light.

Following the LG & E offer, PKEC "upped the ante" offering yet additional value. Recognizing that the PKEC offer was not the highest or best offer, and recognizing the potential for better offers, the Court ultimately ordered a "bidding procedure" in an attempt to force Big Rivers to perform its fiduciary duty of

maximizing the value of the assets of the bankruptcy estate. This course became necessary as it had become painfully obvious that Big Rivers had abandoned its fiduciary duties and it would now be incumbent upon the Court to see that the interests of the estate, the creditors, and the utility customers were properly protected. LG & E submitted the only bid at the hearing but it was 70 million to 120 million dollars more than PKEC originally agreed to pay.

Big Rivers' unflinching devotion to the PKEC agreement without question caused harm to the bankruptcy estate, not only in terms of the insufficient value that would have been achieved by the implementation of that agreement, but additionally by Big Rivers' lack of candor with the Court. As a result of the lack of candor on behalf of Big Rivers and its professionals the Court and many of the parties-in-interest were left blindly in the dark with regard to the catalyst for the course upon which Big Rivers sailed-the No–Shop Clause. This resulted in many months of ineffectual hearings rendered ineffectual due to the failure of Big Rivers and its professionals to disclose this crucially material fact, which was the driving force of its conduct. Thus, hundreds of thousands of dollars were squandered on attorneys fees and other professional fees in the course of this charade. Big Rivers' insistence upon the PKEC deal prolonged the bankruptcy proceeding, resulted in endless motions and appeals to the U.S. District Court, and placed a crippling strain on the bankruptcy estate. Thus, the Court concludes that Big Rivers' strenuous advocacy of the PKEC agreement did not foster, enhance or benefit the reorganization process. To the contrary, it retarded, impeded and disrupted that process.

In a District Court Opinion entered on December 15, 1998, in one of the numerous appeals filed in this case, the Honorable Joseph McKinley, in affirming this Court on another PKEC-related issue, expressly found that the PKEC agreement violated public policy. Judge McKinley eloquently stated:

> This prohibition violates the underlying policy of the Bankruptcy Code to maximize the value of the estate for the creditors by stifling the bidding procedures for the assets of the debtor. The No Shop Clause places Big Rivers in a position of rejecting subsequent proposals to purchase its assets for a greater amount, thereby breaching its duty to the estate. This Court particularly notes that this No Shop Clause completely locked-up the debtor by preventing communication with any third party submitting a bid, whether that bid was higher or lower. Unlike the window shopping provisions in the above mentioned cases, such a condition provides no room for the debtor to fulfill its fiduciary obligation. Under the law, a contract containing such a clause which prevents a party from fulfilling his or her fiduciary duty is void as a violation of public policy. *Kessler v. Jefferson Storage Corp.*, 125 F.2d 108, 110 (6th Cir. 1941) (holding a contract entered between corporation and third party void because third party agreed to pay a portion of the profits on such contract to corporation's president). Thus, the bankruptcy court did not err in holding the Omnibus Agreement void as against public policy. *Pacificorp Kentucky Energy Corp., et al. v. Big Rivers Electric Corp., et al. (In re Big Rivers Electric Corp.)*, 233 B.R. 739, 752–753 (W.D.Ky. 1998).

Accordingly, Big Rivers unequivocally breached its fiduciary obligations by promoting such an agreement so blatantly in violation of public policy. As Judge McKinley further aptly explained:

> This court believes that the bankruptcy court properly found the Omnibus Agreement void as a violation of public policy. A debtor-in-possession owes a fiduciary duty to maximize the value of the estate to all its creditors. *Four B.*

*Corp. v. Food Barn Stores Inc. (In re Food Barn Stores)*, 107 F.3d 558, 564–65 (8th Cir.1997); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3rd Cir.1996); *Metropolitan Airports Com'n v. Northwest Airlines Inc. (In re Midway Airlines Inc.)*, 6 F.3d 492, 494 (7th Cir. 1993); *In re Wintex*, 158 B.R. 540, 543 (D.Mass.1992); *Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prod. Inc.)*, 99 B.R. 124, 131 (Bankr. N.D.Ga.1988). In fact, "[w]hen a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold." *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr.W.D.Mich.1995) (quoting *In re Wintex*, 158 B.R. at 543) (holding duty of debtor to act in good faith and fair dealing in furthering contract was limited by debtors obligation to maximize value for its creditors). Thus, Big Rivers, as a debtor-in-possession, owes a fiduciary duty to all its creditors to maximize the value of the estate.

As the bankruptcy court found, the No Shop Clause interferes with Big Rivers' fiduciary duty. This provision prohibited Big Rivers from initiating, soliciting, or negotiating offers and proposals for the sale or lease of its assets. Thus, Big Rivers could not entertain any competing offer that may bring a higher price for its assets without breaching the Omnibus Agreement.

Thus, finding that Big Rivers not only wasted hundreds of thousands of dollars in attorneys fees and other professionals' fees, but also caused other parties to incur unnecessary fees and expenses of exorbitant amounts in connection with the PKEC fiasco, not to mention wasted time and resources of the Judiciary, the Court cannot at this time possibly perceive how any of Big Rivers' professionals can justifiably be compensated for work done in connection with Big Rivers' unacceptable pursuit of the PKEC plan. Not only do the professionals seek payment for all work in promoting the void PKEC deal, they also want payment for opposing it in the many appeals to the District Court. A review of pre-petition work for the twelve months preceding bankruptcy reflects millions paid by Big Rivers to its professionals for negotiating the PKEC deal.

The Court directs its attention to § 330(a) of the Bankruptcy Code, which authorizes the Court to award reasonable compensation for "actual, necessary" services and expenses. Accordingly, to be compensable, § 330(a) requires the services and expenses to be "both supplied to and beneficial to the estate." *In re Lederman, Enter., Inc.*, 997 F.2d at 1323; *In re Allied Computer Repair, Inc.*, 202 B.R. at 886. In other words, unless the services performed produced a demonstrable benefit to the estate, § 330 does not authorize the Court to award compensation. *Lederman*, 997 F.2d at 1323; *Allied Computer*, 202 B.R. at 886; *Chas. A. Stevens & Co.*, 105 B.R. at 871; *Copeland*, 154 B.R. at 693; *Rhoten*, 44 B.R. at 743; *Vrain Station Co.*, 151 B.R. at 552; *Swansea Consol. Resources, Inc.*, 155 B.R. at 31.

In determining whether a particular professional's services have rendered benefit to the estate, bankruptcy courts throughout the nation have generally focused on the results obtained from the services and expenses for which compensation and reimbursement are sought. Where the results obtained are of disproportionately limited value in comparison to the time and effort expended, a plethora of cases have substantially reduced the fees and expenses requested by the applicant. *Allied Computer*, 202 B.R. at 877 (This court cut applicant law firm's requested fees by $5,551.74, limiting its fees and expenses to one-half of the amount recovered in the adversary proceeding it pursued); *Matter of Taxman Clothing Co.*, 49 F.3d 310 (7th Cir.1990) (Fees reduced from $85,000 to $7,000, where the attorney for the estate pursued an adversary proceeding that spanned many years in terms of litigation and an appeal and that the attor-

ney knew could not result in a benefit of greater than $33,000.00); *In re Amberg*, 148 B.R. at 376 (Fees denied *in toto* because of unsuccessful results); *In re Amstar Ambulance Service, Inc.*, 120 B.R. 391, (Bankr.N.D.W.Va.1990) (Court denied all fees directly related to the preparation and presentation of an unsuccessful Chapter 11 plan and disclosure statement); *In re Associated Grocers of Colorado, Inc.*, 137 B.R. 413 (Bankr.D.Colo.1990) (Fees reduced by 20% to 40% for overall billing where the Court found duplicative billings, tasks lumped together, and a minuscule benefit to the estate); *Chas. A. Stevens & Co.*, 105 B.R. at 866 (Attorney fees and expenses reduced from $336,893.92 to $206,232.60, based largely on the ground that the requested fees were disproportionate to the benefit produced); *In re Coastal Equities, Inc.*, 39 B.R. 304 (Bankr. S.D.Cal.1984) (Court reduced fees by 17.5% for worked performed in connection with a Chapter 11 plan of reorganization that was of limited benefit to the estate); *In re King*, 96 B.R. 206 (W.D.Mo.1989) (Attorney fees denied in whole and interim fees already paid ordered disgorged in an unsuccessful Chapter 11, where the applicant should have known that the services rendered were futile); *Roger J. Au & Son. Inc.*, 114 B.R. at 482 (One-half of time Chapter 11 debtors' counsel spent on activities which yielded no direct benefit to creditors or to the estate was disallowed); *In re S & T Indus., Inc.*, 63 B.R. at 656 (That legal services rendered failed to enhance the progress of the Chapter 11 reorganization was one of three grounds cited by the Court in support of its denial of attorney fees); *St. Vrain Station*, 151 B.R. at 549 (Court reduced fees by 15% where the services rendered a benefit that was disproportionately limited); *In re Toney*, 171 B.R. 414 (Bankr.S.D.Fla.1994) (Where Trustee who retained self to represent estate requested fees of approximately $7,050.00, most of which was attributable to services rendered in pursuing an adversary proceeding in which he recovered only $5,000.00, Court reduced fees and expenses to one-half of the amount recovered).

Moreover, at least one case has held that where the results obtained were a partial or limited success, reduction of attorney fees is not only appropriate, but is mandatory. *Norman v. Housing Auth.*, 836 F.2d 1292, 1302 (11th Cir.1988). The Eleventh Circuit has held that once the lodestar calculation is made, the court must then determine if an adjustment is warranted. *Norman*, 836 F.2d at 1302. "If the result was partial or limited success, then the lodestar must be reduced to an amount that is not excessive." *Id.* (Emphasis added).

■ Accordingly, finding that all professional services rendered in pursuit of the untenable PKEC agreement not only failed to benefit the estate, but further caused injurious harm to the estate, its creditors, and the vulnerable ratepaying utility consumers, this Court feels compelled by the reigns of justice to disapprove all professional fees and expenses rendered in that vein.

The Court's disapproval of fees and expenses related to PKEC matters will be limited to post-petition services. While an enormous amount of time was additionally spent pre-petition in the negotiation and preparation of the PKEC agreement, the Court has decided to refrain from reducing those fees as none of the parties-in-interest have voiced an objection to the incurrence of those fees and expenses. Specifically, it is the RUS that has been the most significant recipient of the additional millions of dollars brought into the estate as a result of the rejection of the PKEC agreement and the bidding procedure held instead by this Court. Thus, it is the RUS that would have sustained the greatest negative financial impact if the PKEC agreement had been allowed to stand. Nevertheless, the RUS stood complacently by, voicing not even the slightest concern over the wasteful squandering of attorney time and resources expended on an agree-

ment that would have been detrimental not only to the bankruptcy estate as a whole, but specifically detrimental to its own self-interests. Such indolence on behalf of the RUS certainly does nothing to incite this Court to go back beyond the petition date to cut pre-petition fees and expenses in the PKEC escapade. As the most substantial beneficiaries of the Court's fee and expense monitoring powers have failed to voice any concern with regard to this matter, the Court will limit its reduction of fees to the post-petition period.

Based on the above findings, the fees and expenses of each of the professionals having performed PKEC-related services will be addressed individually, as follows.

### A. ARTHUR ANDERSON.

Arthur Anderson requests professional fees in the amount of $1,169,118.50 and expenses in the amount of $12,709.75, or a total of $1,181,828.25. Of that amount, fees totalling $38,570.00 are attributable to the post-petition performance of PKEC-related work. Accordingly, the Court will reduce Arthur Anderson's requested fees by that amount, and will approve its Application for professional fees and expenses in the amount of $1,143,258.25.

### B. WHEELER PEAK CONSULTING CORPORATION.

Wheeler Peak has requested professional fees in the amount of $580,231.20 and expenses of $171,275.14, for a total of $751,506.34. Of that amount, professional fees totalling $42,351.00 are attributable to post-petition PKEC-related services. Accordingly, Wheeler Peak's requested fees will be reduced in that amount. Thus, the Court will approve Wheeler Peak's Application for professional fees and expenses in the total amount of $709,155.34.

### C. THE BRATTLE GROUP.

The Brattle Group has requested professional fees in the amount of $489,993.75 and expenses in the amount of $37,243.77, for the total amount of $527,237.52. Of that amount, professional fees in the amount of $173,017.50 and expenses in the amount of $17,018.61 are attributable to post-petition PKEC -related services, for a total of $190,036.11. Thus, the Brattle Group's requested professional fees and expenses will be reduced in that amount, and the Court will approve its application in the total amount of $337,201.41.

### D. LONG ALDRIDGE & NORMAN.

LAN has requested professional fees in the amount of $6,713,240.05 and expenses in the amount of $536,726.63, for a total of $7,249,966.68. With regard to the attorneys fees, $1,559,892.50 of the total amount is attributable to post-petition services on PKEC-related matters. Thus, its requested fees for services rendered will be reduced by that amount. With regard to expenses, however, LAN has reported that it cannot segment the expenses relative to PKEC-related matters due to its bookkeeping mechanisms. Accordingly, the Court will deny expenses by the same percentage as the professional fees for PKEC-related matters bears to the total fees requested. The PKEC-related fees is 23.24% of the total fees requested. Hence, the expenses will be disapproved by the same percentage, resulting in a reduction of $124,714.12.

In summation, the total fees and expenses requested by LAN equals $7,249,966.68. Of this amount, a total of $1,684,606.62 is deemed attributable to post-petition services performed on PKEC-related matters and will not be approved. Thus, LAN's Application will be approved in the amount of $5,565,360.06.

### E. UTILITY AND ECONOMIC CONSULTING, INC.

Utility and Economic Consulting has requested professional fees in the sum of $173,762.50 and expenses in the sum of $12,784.08, for a total of $186,546.58. Of the fees requested, $24,562.50 are for post-

petition PKEC -related services, and will, accordingly, be disallowed. Like LAN, Utility and Economic Consulting also reports that it is unable to segment the PKEC-related expenses, due to its bookkeeping system. Thus, the Court will here also deny the same percentage of expenses as the professional fees for PKEC-related matters bears to the total fees requested. The PKEC-related fees is 14.14% of the total fees requested. Thus, the total expenses will be disallowed by the same percentage, resulting in a reduction of $1,807.12.

In summation, the total fees and expenses requested by Utility and Economic Consulting equals $186,546.58. Of this amount, a total of $26,369.62 is deemed attributable to post-petition PKEC-related services and will not be approved. Thus, Utility and Economic Consulting's Application will be approved in the amount of $160,176.96.

### F. SULLIVAN, MOUNTJOY, STAINBACK, & MILLER.

SMSM has requested professional fees of $2,243,411.90 and expenses of $248,901.73, for a total of $2,492,313.63. Of that amount, $171,637.20 of the fees are for post-petition PKEC-related services, and will not be approved. Again, SMSM reports that it cannot segment the PKEC-related expenses due to its bookkeeping procedures. Thus, the Court will deny the same percentage of expenses as the professional fees for PKEC-related matters bears to the total fees requested. The PKEC-related fees constitute 7.7% of the total fees requested. Thus, the total expenses will be disallowed by the same percentage, resulting in a reduction of $19,042.78.

In summation, the total fees and expenses requested by SMSM equals $2,492,313.63. Of this amount, a total of $190,679.98 is deemed attributable to post-petition PKEC-related services and will not be approved. Accordingly, SMSM's

Application will be approved in the amount of $2,301,633.65.

### CONCLUSION

For the above-stated reasons, this Court by separate Order shall approve the fee applications of Big Rivers' professionals in the following amounts:

(1) Wilamette Management Associates' Application will be approved in the total amount of $108,144.86;

(2) Orrick, Herrington & Sutcliff's Application will be approved in the total amount of $451,747.63;

(3) Arthur Anderson, LLP's Application will be approved in the total amount of $1,143,258.25;

(4) Wheeler Peak Consulting Corporation's Application will be approved in the total amount of $709,155.34.

(5) The Brattle Group's Application will be approved in the total amount of $337,201.41;

(6) Long, Aldridge & Norman's Application will be approved in the total amount of $5,565,360.06;

(7) Utility and Economic Consulting, Inc.'s Application will be approved in the total amount of $160,176.96; and

(8) Sullivan, Mountjoy, Stainback, & Miller's Application will be approved in the total amount of $2,301,633.65.

All other fees and expenses will be denied.

Each professional submitted Interim Fee Applications & objections were filed by the banks each time. The Court entered Orders on each and every Interim Application authorizing payment of 75%, with a hold back of 25%. Each Order provided that all fees would be reviewed at the conclusion of the case and that any fees not allowed would be disgorged. Late in the case, the Court authorized the payment of 15% of the holdback, leaving only 10% as a holdback. Therefore, some of the professionals have been paid sums in

excess of the amounts approved above. Those professionals shall refund such sums to Big Rivers within 10 days.

Separate Orders will be entered consistent with this Memorandum Opinion.